RAMÓN NEGRÓN SOTO, demandante y recurrido, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, HON. CARLOS ROMERO BARCELÓ en su capacidad de GOBERNADOR DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, y OTROS, demandados y recurrentes.

Número: R-80-254          Resuelto: 30 de enero de 1981

*Héctor A. Colón Cruz, Procurador General, y Américo Serra, Procurador General Auxiliar,* abogados del Estado Libre Asociado de Puerto Rico; *Salvador Antonnetti Zequeira,*

*Edilberto Berríos Dávila* y *David Carrión Fuentes,* abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

La solución del caso conlleva detectar correctamente el propósito legislativo de una ley establecida para beneficio del Poder Judicial. Si bien en la función de interpretar e impartir justicia somos autónomos e independientes, nuestros fallos siempre deben corresponder a un escrupuloso marco de juridicidad. Por ello, de ordinario, esta labor resulta delicada, ya que "[n]o somos autómatas del derecho, ajenos a las injusticias, al dolor o a los agravios. No vivimos en mundos distantes o apartes. Neutralidad judicial no es sinónimo de insensibilidad". Véase *Ortiz Angleró* v. *Barreto Pérez,* 110 D.P.R. 84, 94–95 (1980).

El trasfondo fáctico y legal en que se debate este drama apelativo, se suscita con la sentencia del Tribunal Superior, Sala de Carolina, decretando *injunction* permanente contra el Gobernador de Puerto Rico y cualquier funcionario del Estado Libre Asociado, y prohibiendo la sustitución del demandante-recurrido, Ramón Negrón Soto, del cargo que ostenta como Juez Superior, bajo el fundamento de que su término de doce años no ha vencido por excluirse de su cómputo —en virtud de la Ley Núm. 70 de 14 de junio de 1974 (4 L.P.R.A. sec. 331)— el período comprendido entre el 17 de junio de 1974 y 16 de octubre de 1977 en que, en atención a sus méritos, por designación del Juez Presidente, Hon. José Trías Monge, ocupó el puesto de Director Administrativo de los Tribunales.

## I

La solución de esta controversia exige un análisis objetivo, ponderado y jurídico y una breve referencia a ciertas características elementales de la estructura constitucional vigente sobre el Poder Judicial.

La Constitución está concebida en una forma republicana de gobierno, a base de la doctrina de "separación de poderes" y "frenos y contrapesos". Distribuye entre sus tres ramas los poderes públicos bajo la premisa de que tal equilibrio es saludable y necesario para mantener una verdadera democracia, evitando así una excesiva concentración en una de ellas con los peligros que ello conlleva. Sobre el Poder Judicial depositó y encomendó el salvaguardar comunitariamente "el respeto a los derechos contra cualquier intervención contraria a esos derechos por el Poder Ejecutivo o Legislativo, solucionar los conflictos entre lo privado y público y adjudicar las controversias entre los individuos".[1] Para implementar y lograr una máxima eficiencia, estimó necesaria la mayor independencia de la Rama Judicial, proveyendo en su Art. V las siguientes características en medidas y prerrogativas: (a) la unificación del sistema judicial en lo concerniente a jurisdicción, funcionamiento y administración; (b) la estabilidad en los términos de cargos de los jueces y prohibición en la reducción de tales términos; (c) la adopción por el Tribunal Supremo de reglas de procedimiento civil, criminal y de evidencia; (d) la garantía contra la disminución de la compensación de los jueces; (e) el mandato de la Asamblea Legislativa de establecer "un sistema de retiro para los jueces", obligatorio a los setenta (70) años; (f) el traslado a la Rama Judicial del poder de destitución o separación de jueces de instancia; (g) la prohibición de participar los jueces durante la incumbencia del cargo en actividades políticas u optar a puestos directivos en los partidos; y (h) estabilidad en la composición numérica de jueces del Tribunal Supremo, salvo cambio a petición de éste.[2]

---

[1] *Informe sometido al Consejo sobre la Reforma de la Justicia en Puerto Rico por la Comisión para el Estudio de los Tribunales*, pág. 1 (1974).

[2] *Diario de Sesiones de la Convención Constituyente*, Ed. Equity, 1961, T. 1, págs. 452–453; T. 4, págs. 2609–2614.

■ En adición, transfirió la administración de los tribunales del Poder Ejecutivo al Judicial, confiriendo al Juez Presidente su dirección y el nombrar "un Director Administrativo . . . quien desempeñará su cargo a discreción de dicho magistrado". Para implementar esta disposición constitucional, la Ley Núm. 11 de 24 de julio de 1952 —denominada Ley de la Judicatura— creó la Oficina de Administración de los Tribunales, 4 L.P.R.A. sec. 331. La amplia facultad otorgada al Juez Presidente y por delegación de éste a su portavoz, el Director Administrativo, siempre exigió —tradicionalmente lograda— que quedara claramente delineada y separada la esfera de acción administrativa de ambos funcionarios, en cuanto a la función de índole judicial de los jueces. En cuanto a la adjudicación de casos, existen una autonomía y prerrogativa absolutas de los magistrados en las que los superiores jerárquicos administrativos antes mencionados no pueden intervenir directa ni indirectamente. En otras palabras, en el descargo de sus deberes, el juez no tiene otros superiores jerárquicos que la Ley y la Justicia.

■ Sin embargo, cabe resaltar que históricamente se ha reconocido la facultad del Juez Presidente para administrativamente relevar temporalmente a un juez de sus funciones judiciales y asignarle encomiendas especiales en distintos aspectos relacionados con la administración de justicia u obligaciones del primero. (3) Tales asignaciones, por originarse

---

(3) A manera de algunos ejemplos: asignaciones de jueces como Funcionarios Ejecutivos para auxiliar al Juez Presidente como miembro de la Junta Constitucional de Revisión de Distritos Electorales, Senatoriales y Representativos (Designaciones fechadas 10 de abril de 1963 y 8 de junio de 1971); Secretario del Consejo sobre la Reforma del Sistema de Justicia (7 de mayo de 1973); y Director Administrativo Auxiliar de los Tribunales (6 de diciembre de 1977). Nótese que estas instancias presentan como características comunes: (a) son designaciones temporales del Juez Presidente; (b) se relacionan con asuntos u obligaciones de éste o la administración de la justicia; (c) no existe incompatibilidad ética entre el cargo de juez y la asignación especial; y (d) el juez continúa *dentro* de la Rama Judicial, pero suspendidas sus funciones judiciales.

Bajo la estructura constitucional vigente, plantearían serias interro-

en el Juez Presidente y estar comprendidas dentro de zonas de acción de la administración de justicia, no implican que el juez concernido cesa en su cargo, sino que continúa en el mismo, aunque desempeñándose en una tarea dentro de la Rama Judicial. *Como corolario, el término de nombramiento de ese magistrado continúa corriendo.*

Independientemente de su sabiduría, (⁴) pero formulado precisamente en la doctrina de frenos y contrapesos antes expuesta, la Asamblea Constituyente, previo extenso debate, optó por disponer que los "jueces [fueran] nombrados por el Gobernador con el consejo y consentimiento del Senado . . .", y que sus términos fueran fijados por "ley". La Ley de la Judicatura proveyó el término de doce y ocho años para los jueces Superiores y de Distrito, respectivamente. 4 L.P.R.A. secs. 92 y 152.

---

gantes de legalidad e incompatibilidad el que se pretendiera que un juez ocupara un cargo creado por ley fuera de la Rama Judicial y nombrado por los otros dos poderes.

(⁴) El peligro de concentrar demasiado poder en una rama de gobierno es evidente. La designación y nombramiento de los jueces exclusivamente por el Poder Judicial, sin la intervención de los otros Poderes, como se ha sugerido, podría crear una "hegemonía de magistrados" o "magistrarcado", con personas que se renovarían automáticamente sin estar sujetas al escrutinio de funcionarios electos en comicios periódicos. Por otro lado, "[e]s incuestionable que mientras mayor sea el término de duración de un juez en su cargo, menos intervenciones ajenas habrá que afecten la imparcialidad e independencia judicial que debe permear y caracterizar un sistema judicial. La estabilidad que tales términos imprimen y la ausencia de las presiones psicológicas que la renovación del término de juez conlleva, son fundamentos suficientes para favorecer tal enfoque.

"No obstante, preciso es ponderar que ciertos períodos muy extensos y los cargos [de], por vida —sin el diseño de mecanismos apropiados que permitan la revisión y evaluación de los incumbentes, y su separación del servicio por causas no autorizadas al presente— puede[n] propiciar que se mantengan en sus cargos personas incompetentes o cuyo estado físico o mental le[s incapacite] para continuar en el mismo. Cualquier recomendación debe contemplar el establecimiento de la carrera judicial, un balance razonable entre términos extensos, que en el proceso de renominación de un juez no intervengan consideraciones político-partidistas, y la creación de mecanismos adicionales de separación del cargo por causas justificadas." *Informe sometido al Consejo sobre la Reforma de la Justicia en Puerto Rico por la Comisión para el Estudio de los Tribunales*, ante, págs. 108–109.

Otra instancia limitativa de una facultad constitucional, esta vez sobre la Asamblea Legislativa, es el precepto de que "ninguna ley prorrogará el término de un funcionario público" durante su incumbencia. Art. VI, Sec. 10. Su lenguaje claro y sencillo no admite duda o interpretación en contrario. Su historial, aunque escaso, pone de manifiesto un interés de evitar que se perpetúen y congelen, para beneficio de los incumbentes, determinados cargos.

## II

En lo que atañe a disposición legal ante nuestra consideración, sus antecedentes pueden esbozarse en tres etapas.

La *primera*, en que su texto original —que decreta incompatibilidad entre el cargo de Director Administrativo de los Tribunales o cualesquiera otros funcionarios o empleados de dicha Oficina y el ejercicio de la profesión de abogado— es enmendado por la Ley Núm. 66 de 25 de junio de 1959, para aclarar que no era requisito del puesto de Director la admisión al ejercicio de la abogacía. *Hasta este momento la ley no visualizaba expresamente su ocupación por un juez de instancia.*

La *segunda* etapa puede precisarse para el año 1960, mediante la Ley Núm. 103 de 29 de junio. Se contempla entonces la posibilidad de que un juez en propiedad del Tribunal *Superior* sea nombrado Director Administrativo, al disponerse que dicho magistrado retendría todos sus derechos al amparo de la *Ley de Retiro de la Judicatura,* y el tiempo que actuara como Director se le acreditaría *como si hubiera servido como Juez Superior.* Subsiguientemente, en virtud de la Ley Núm. 42 de 29 de mayo de 1964, se estableció que si el Juez Superior designado Director *fuere nuevamente nombrado para ocupar el cargo de Juez Superior,* recibiría en su nueva posición el sueldo que le habría correspondido de haber continuado ininterrumpidamente en su anterior cargo judicial. *En conse-*

*cuencia, el tiempo servido como Director Administrativo le sería acreditado como servido en calidad de Juez Superior.*

A manera de paréntesis, cabe destacar que, hasta esta última legislación, la eventualidad de que un Juez Superior fuera nombrado Director Administrativo de los Tribunales *conllevaba una renuncia al cargo judicial.* La protección que le brindaba el estatuto era reconocerle y extenderle derecho a cotizar bajo la Ley de Retiro de la Judicatura mientras estuviese actuando como Director Administrativo. *Es innegable que terminada su designación de Director Administrativo, únicamente podía regresar a la Judicatura a través del trámite constitucional de nombramiento por el Gobernador con el consejo y consentimiento del Senado.*

Para esta época la Rama Judicial había acumulado una vasta experiencia sobre el proceso decisional y las dificultades de reclutamiento y retención de personas idóneas para el cargo de Director Administrativo. La naturaleza singular del puesto ponía de manifiesto que en la judicatura había un número significativo de candidatos capacitados, pero comprometidos básicamente con el quehacer jurídico, que de ordinario mostraban renuencia a abandonar el foro judicial. Esta actitud se acentuaba en vista de que el cargo era a discreción del Juez Presidente y que, para luego reintegrarse a la judicatura, era menester un nuevo nombramiento del Ejecutivo y la confirmación por el Senado.

Así las cosas, el año 1974 marca la *tercera* época, al producirse el citado Informe sometido al Consejo por la Comisión para el Estudio de los Tribunales. En lo pertinente consignó:

La enmienda . . . es a los efectos de que al Juez Presidente se le conceda la facultad de que cuando está vacante el cargo de Director Administrativo si así lo creyere prudente, pueda cubrirlo mediante el nombramiento de un Juez del Tribunal de Primera Instancia; *quien retendrá su cargo y condición de juez mientras desempeña las funciones de Director Administrativo.*

Es necesario consignar que las disposiciones de ley enmendatorias deben contener lenguaje claro y preciso de que tal desig-

nación conlleva un relevo total y absoluto, y un impedimento en la realización de cualesquiera funciones judiciales u otras índoles, *que emanen de la condición de juez.*

*Este efecto, suspendiendo las facultades de Juez, es la única forma de evitar una confusión o combinación en una sola persona de poderes y funciones de génesis constitucional: como Director en funciones administrativas y como Juez en funciones judiciales.*

Respecto al salario, mientras estuviese dirigiendo la Oficina de Administración de Tribunales, devengaría el correspondiente a este cargo, sujeto a las disposiciones de la Ley de Retiro de la Judicatura.

El Juez Presidente, a su discreción, *podría reasignar a dicho juez para prestar servicios nuevamente en una de las Salas del Tribunal de Primera Instancia.*

Las ventajas de esta enmienda, a juicio de la Comisión, podrían resumirse del siguiente modo:

1. Permitiría al Juez Presidente seleccionar y reclutar de la judicatura de Primera Instancia aquel candidato de mejores cualidades para el cargo;

2. Sería más atractivo a los miembros de la Judicatura la aceptación del cargo, *ya que ello no representaría una renuncia ni el desvincularse de ésta;* y

3. Contribuiría a un proceso de renovación constante en la dirección y administración de Tribunales. (Bastardillas nuestras.) Págs. 12–13.

Consecuentemente, la Comisión recomendó una enmienda de ley "a los efectos de que se le conceda al Juez Presidente la facultad de que cuando esté vacante el cargo de Director Administrativo, si así lo creyera prudente, pueda cubrir dicho cargo mediante el nombramiento de un Juez del Tribunal de Primera Instancia, *quien retendrá su cargo y condición de Juez mientras desempeñe las funciones de Director Administrativo".* (Bastardillas nuestras.) Pág. 15. Esta propuesta encontró eco en el Primer Ejecutivo —quien, en Mensaje Especial a la Séptima Asamblea Legislativa, Segunda Sesión Ordinaria, sobre la Reforma del Sistema de Justicia, de 14 de marzo de 1974— expuso:

Por la importancia del puesto y por el significado que representa para la Rama Judicial, propongo una enmienda a la sección 25 de la Ley de la Judicatura —Ley Núm. 11 de 24 julio de 1952— para disponer que cuando el Juez Presidente del Tribunal Supremo nombre a un Juez del Tribunal de Primera Instancia para el cargo de Director Administrativo de los Tribunales, el magistrado designado *no pierda su condición de Juez,* aún cuando sus facultades y funciones judiciales queden suspendidas mientras ocupe el nuevo cargo.

Esto no implica una limitación o directriz para el Juez Presidente del Tribunal Supremo como poder nominador constitucional, sino que amplía su campo de selección. (Bastardillas nuestras.) Pág. 15.

Como resultado, se presentaron dos proyectos de ley idénticos: P. de la C. 928 y P. del S. 754. El trámite legislativo desde sus inicios reflejó indubitada e incontrovertidamente que su propósito era *superar* la situación estatutaria de entonces —que exigía que un juez así designado renunciara a su cargo antes de poder aceptar el de Director Administrativo y que tuviera que ser nombrado nuevamente si quería reintegrarse a la judicatura— para que *"dicho magistrado retenga su condición de Juez mientras se desempeñe como Director Administrativo de los Tribunales, con la salvedad de que se le releve total y absolutamente de sus funciones judiciales".* (Bastardillas nuestras.) Se recalcó que ello "no representaría una renuncia al cargo de Juez". (Memorando Explicativo del P. de la C. 928.) Con idéntica tónica se explicó el alcance de la medida en los informes separados de las Comisiones Jurídico-Civil de la Cámara de Representantes y del Senado —de 30 de abril y 10 de mayo de 1974 respectivamente— al reiterarse en el primero, que "cuando el nombramiento de Director Administrativo de los Tribunales recaiga en una persona que esté ocupando el cargo de Juez en el Tribunal de Primera Instancia, dicha persona *retendrá su cargo, condición y derechos de juez mientras desempeñe las funciones de Director Administrativo,* pero quedará totalmente relevado de las fun-

ciones judiciales o de otras que emanen de su condición de juez . . . [y] la aceptación del cargo *no representaría una renuncia o desvinculación de la misma"*, y en el Informe del Senado, nuevamente se indica que el magistrado así designado ". . . continuaría en la Judicatura" reteniendo "su *cargo, condición y derechos de juez* mientras desempeñe tales funciones. *La designación no afectaría el transcurso del término de nombramiento correspondiente al cargo de Juez del Tribunal de Primera Instancia* ni los derechos correspondientes al amparo de las disposiciones de la Ley de Retiro de la Judicatura. El tiempo que actúe como Director Administrativo se le acreditará para fines de retiro". Terminaba dicho Informe atribuyéndole a la enmienda, entre otras, la ventaja de que "los miembros de la judicatura que fueren seleccionados estarían atraídos a aceptar el cargo porque *no representaría una renuncia a la Judicatura . . .*". (Bastardillas nuestras.)

Finalmente, la Asamblea Legislativa aprobó el P. de la C. 928, que se convirtió en la Ley Núm. 70 de 14 de junio de 1974. Reza:

Si el nombramiento de Director Administrativo recayere en una persona que esté ocupando un cargo como Juez del Tribunal de Primera Instancia de Puerto Rico, dicha persona así designada, *retendrá a todos los fines pertinentes, su cargo, condición y derechos* de Juez mientras desempeñe las funciones de Director Administrativo. Disponiéndose, que tal designación conllevará un relevo total y absoluto, y un impedimento en la realización de cualesquiera *funciones judiciales* o de otras índoles que emanen *de la condición de Juez, las cuales quedarán suspendidas* mientras se desempeñe como Director Administrativo de los Tribunales. Durante tal período devengará el sueldo correspondiente al cargo de Director Administrativo *o el correspondiente a su cargo de Juez,* de los dos, el mayor y, una vez cese en el mismo, recibirá aquel sueldo que le habría correspondido si hubiera continuado las funciones ininterrumpidamente en su cargo de Juez del Tribunal de Primera Instancia. *Tal designación no afectará el transcurso del término de nombramiento correspon-*

*diente al cargo de Juez del Tribunal de Primera Instancia que ostente,* ni los derechos al amparo de las disposiciones de la Ley de Retiro de la Judicatura. . . . El tiempo en que actúe como Director Administrativo de los Tribunales se le acreditará para fines de retiro. (Bastardillas nuestras.)

### III

De los antecedentes históricos, estudios, proceso y motivo legislativo y texto, se puede concluir que la ley vigente introdujo las siguientes enmiendas sustanciales: (a) amplió la capacidad nominativa del Juez Presidente al reconocer y hacer extensiva su cubierta estatutaria y beneficios a jueces de primera instancia; (b) el magistrado designado *continuaría siendo juez;* (c) quedaría relevado automáticamente de sus deberes y funciones judiciales; (d) el magistrado devengaría el sueldo mayor durante su incumbencia administrativa. Siguieron inalterados los derechos existentes al amparo de la Ley de Retiro de la Judicatura al igual de que acrecerían, al reintegrarse al cargo de Juez, los aumentos decretados a la judicatura.

Se puede afirmar, pues, inequívocamente, la existencia de una clara intención estatutaria de que el magistrado designado Director Administrativo por el Juez Presidente —fuera del Tribunal de Distrito o Superior— *continuaría siendo juez, reteniendo tal cargo, pues ello no representaría una renuncia ni desvinculación de la judicatura.* Si tal designación no implica una separación de la Rama Judicial, como tampoco una renuncia al cargo de juez, ¿cómo puede afirmarse que el término del nombramiento no continúa transcurriendo? Ciertamente, una cosa es la suspensión de las funciones judiciales durante la incumbencia como Director, y otra la congelación del período regular de nombramiento del cargo de juez.

La ilustrada sala de instancia, al concluir lo contrario, parte de la premisa de que el estatuto es ambiguo y, por ende, debe ser interpretado. La dificultad de este razonamiento es

que la ley, con apoyo en su legajo, es todo lo contrario: *clara*. No hay margen para inferir otro sentido de las expresiones de que el magistrado retendría su condición de juez y ello no conllevaría una renuncia. Más aún, hemos visto que expresamente consigna que una vez el juez de primera instancia es designado Director Administrativo de los Tribunales ". . . [t]al designación *no afectará el transcurso del término de nombramiento correspondiente al cargo de Juez* del Tribunal de Primera Instancia que ostente . . .". (Bastardillas nuestras.) Este lenguaje, en el espíritu expuesto, no tiene otro significado que el de aclarar y estipular que la designación no afectaría ni alteraría que discurriera el tiempo o término original para el cual fue nombrado Juez.

La forma verbal "afectar" debe interpretarse considerando el objeto directo "transcurso". "Transcurso" es la acción de transcurrir, ([5]) y "transcurrir" es el fluir incesante del tiempo, ([6]) o el paso o carrera del tiempo. ([7]) Por otro lado, "afectar" está definido como "menoscabar, perjudicar, influir desfavorablemente", y como "producir alteración o mudanza en alguna cosa". ([8]) También se define como "influir", "producir efecto en una cosa determinada, disminuir". ([9]) Es forzoso concluir que el fluir incesante del tiempo, o su paso o carrera, no queda afectado o menoscabado o perjudicado con respecto al término, límite o duración del cargo de juez mientras éste ocupe la posición de Director Administrativo. En otras palabras, si la acción de transcurrir no queda afectada, el transcurso del tiempo continúa, no se paraliza ni suspende. "No afectará", en su más corriente y usual signifi-

---

([5]) M. Moliner, *Diccionario de Uso del Español*, Madrid, Ed. Gredos, 1977.

([6]) G. Cabanellas, *Diccionario de Derecho Usual*, 5ta ed., Madrid, Ed. Santillana.

([7]) Real Academia Española, *Diccionario de la Lengua Española*, 19na ed., Ed. Espasa-Calpe, 1970.

([8]) *Diccionario de la Lengua Española*, supra.

([9]) *Diccionario de Uso del Español*, supra.

cación, no quiere decir otra cosa que no producirá ningún efecto, esto es, que no tendrá ningún efecto sobre el fluir del tiempo. Éste continúa fluyendo. Si el legislador hubiese querido que el transcurso del término se paralizase o suspendiese, así lo hubiera expresado inequívocamente. Concluimos, por tanto, que es errónea la interpretación en el sentido de que el vocablo "afectar" significa que paraliza, detiene o suspende el fluir del tiempo, con el resultado de que "extiende" o "prorroga" el término de doce años por el que fue nombrado el juez sujeto de este recurso, al expresar que el término durante el cual sirvió como Director Administrativo no le cuenta para el término por el que fue nombrado juez.

Además, el foro primario incurre en el error de comparar este estatuto con el Art. 1.017A de la Ley Electoral de Puerto Rico —Núm. 85 de 28 de junio de 1978—, que cubre la situación cuando un juez es nombrado Miembro de la Junta Revisora Electoral. Hemos de reconocer que dicha Ley está redactada en términos generales similares a los de la Ley Núm. 70 de 14 de junio de 1974, y, además, está inspirada en conceder *supuestamente* iguales beneficios al juez así nombrado para dicha Junta Revisora Electoral.

El uso de esta analogía presenta la dificultad de que la Ley Núm. 70 contempla la designación del cargo de Director Administrativo de los Tribunales creado por el Art. V, Sec. 7 de la Constitución y por la Sec. 25 de la Ley de la Judicatura, a discreción del Juez Presidente del Tribunal Supremo. Por otro lado, la Ley Núm. 85 de 28 de junio de 1978 versa sobre un nombramiento por el Gobernador de Puerto Rico de un juez para miembro de la Junta Revisora Electoral, creado por la Ley Electoral de Puerto Rico. Ya hemos indicado nuestra preocupación y las serias interrogantes constitucionales que plantea esta última situación, a saber, el que un juez ocupe un cargo o puesto *fuera de la Rama Judicial*, en cualesquiera de las otras dos ramas y que, mientras tanto, continúe vinculado

a la judicatura. Ello parecería interferir con los parámetros constitucionales de cada Poder.

## IV

Ahora bien, para fines de discusión hemos de suponer como plausible prima facie la conclusión del tribunal sentenciador "... como una cuestión de derecho que cuando la Legislatura que aprobó la Ley Núm. 70 dice que *'tal designación no afectará el transcurso del término de nombramiento correspondiente al cargo de Juez del Tribunal de Primera Instancia que ostente'*, lo que realmente quiso decir es que mientras la persona designada desempeñe el cargo de Director Administrativo, el término que le falte de su nombramiento no va a quedar afectado y aquella parte del mismo no vencido aún transcurrirá una vez la persona se reintegre a su cargo de juez". (Bastardillas en el original.)

■ A poco que reflexionemos nos percatamos que de interpretar la referida Sec. 25 de la Ley de la Judicatura en el sentido de que el término servido por un Juez Superior como Director Administrativo de los Tribunales no se le rebajará del término de doce años para el cual fuera nombrado como juez, vulneraría la prohibición constitucional de que "[n]inguna ley prorrogará el término de un funcionario público ni disminuirá su sueldo o emolumentos *después* de su elección o nombramiento". Art. VI, Sec. 10.

El Juez recurrido tomó posesión de su cargo como Juez del Tribunal Superior en 27 de marzo de 1968. Hemos visto que a esa fecha la Ley de la Judicatura disponía que el nombramiento sería por doce años y hasta que su sucesor fuese nombrado. Por tanto, cronológicamente su término expiró el 26 de marzo de 1980.

No fue hasta el 14 de junio de 1974 que se enmendó la Sec. 25 de la Ley de la Judicatura para autorizar la designación, por el Juez Presidente del Tribunal Supremo, de un juez para el cargo de Director Administrativo de los Tribuna-

les, disponiendo que dicho juez ". . . retendrá a todos los fines pertinentes, su cargo, condición y derechos de Juez mientras desempeña las funciones de Director Administrativo". Al amparo de la referida enmienda, el Juez Presidente designó al juez recurrido como Director Administrativo.

Comoquiera que ya ocupaba el cargo de juez que vencería el 26 de marzo de 1980, no podía aprobarse ninguna ley que extendiera el vencimiento del nombramiento de juez para una fecha que recayere después de dicho vencimiento. Si se entendiese que durante el término de tres años cuatro meses en que ocupó el puesto de Director Administrativo quedó suspendido el transcurso del término de su cargo judicial, el vencimiento de dicho cargo se extendería por el referido período adicional, lo que chocaría con la prohibición constitucional mencionada.

El foro de instancia estimó erróneamente que las Leyes Núms. 70 y 85 "lo que hacen es *interrumpir* el término de nombramiento de un funcionario, *no lo prorrogan*". (Bastardillas nuestras.) No existe tal diferencia. Ya se caracterice como interrupción, o se usen los sinónimos *suspensión*, *paro*, u otros, nos parece que el *efecto único* del estatuto, así interpretado, es prorrogar el término de nombramiento del juez concernido en el caso de autos, aplazando, demorando o prolongando por 40 meses adicionales el término de doce años del Juez Negrón Soto. Sea *directamente* mediante disposición de ley expresa, o *indirectamente*, por interpretación judicial, esta consecuencia precisamente está vedada por la prohibición constitucional precedentemente aludida.

Por ende, bajo cualesquiera alternativas de hermenéutica, la premisa de que la ley que nos ocupa extiende el término del juez mientras éste se desempeña como Director Administrativo, violenta la Constitución. La forma de superar este escollo es considerar que la ley no prorroga el término, por no disponerlo así su texto como tampoco permitirlo su interpretación. De ese modo, por ser cónsona, cumple con la regla básica de hermenéutica que favorece el mantenimiento de la

constitucionalidad de una ley. *Martínez* v. *Tribunal Superior*, 81 D.P.R. 945, 953 (1960) ; *E.L.A.* v. *Aguayo*, 80 D.P.R. 552, 596 (1958).

*Se revocará la Sentencia del Tribunal Superior, Sala de Carolina fechada 9 de mayo de 1980.*

El Juez Asociado Señor Rigau emitió opinión disidente. El Juez Presidente Señor Trías Monge y los Jueces Asociados Señores Dávila y Torres Rigual se inhibieron. El Juez Asociado Señor Díaz Cruz no participó en la decisión.

—O—

Opinión disidente emitida por el Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 30 de enero de 1981

En este caso la controversia inmediata gira sobre la cuestión de si está vencido o no el nombramiento por doce años de un Juez Superior de Puerto Rico. Decimos la "controversia inmediata" porque, además de esa, forma parte de la atmósfera del caso la controversia mayor de si una decisión adversa al demandado constituye una indebida o ilegal intromisión del Poder Judicial en la facultad de nombramiento del Primer Ejecutivo del país. Hemos de dirigirnos a ambas cuestiones, ya que estimamos que es de considerable importancia que se aclaren en lo posible las mismas.

Sobre el nombramiento de jueces, la Sec. 8 del Art. V de la Constitución de Puerto Rico dispone, en lo pertinente, que los jueces serán nombrados por el Gobernador con el consejo y consentimiento del Senado. El término por el cual servirán los Jueces del Tribunal Supremo está fijado por la Constitución y los términos para los Jueces del Tribunal de Primera Instancia están fijados por ley.

Como parte de la reforma política y administrativa que se llevó a cabo en Puerto Rico en la década del '50, (¹) Puerto

---

(¹) *The Annals of the American Academy of Political and Social Science,* Vol. 285, enero 1953, pág. 33; Henry Wells, *The Modernization of*

Rico se dio una Constitución moderna, con un moderno Artículo Judicial —el Art. V de dicha Constitución— y una excelente Ley de la Judicatura, la cual siguió las líneas generales del mejor pensamiento contemporáneo sobre la materia. 4 L.P.R.A. sec. 1 y ss.

La Convención Constituyente de Puerto Rico, la cual aprobó la Constitución de este país, y la Asamblea Legislativa y el Gobernador de Puerto Rico, quienes aprobaron la Ley de la Judicatura, no trataron livianamente los importantes asuntos de la independencia judicial y de la organización de dicha rama. Así se ha reconocido generalmente. El citado Artículo de la Constitución —el Artículo Judicial— mereció el siguiente comentario de Roscoe Pound:

Your letter of November 30th, [1952] with a copy of the Judicial Article which the Committee on the Judiciary has submitted to the Constitutional Convention for adoption as part of the Constitution now being drafted for Puerto Rico, was delayed in reaching me. I have just read it attentively and feel that you and your Committee are to be congratulated on an excellent bit of work. Your draft seems to me to be in accord with the best that has been thought and written on the subject, and entirely justified by experience. The unified judicial organization which you propose will put Puerto Rico in the forefront not only of American jurisdictions but of countries generally. (Carta del Profesor Pound al Hon. Ernesto Ramos Antonini, Presidente de la Cámara de Representantes de la Asamblea Legislativa de Puerto Rico, fechada a enero 3 de 1952. Obra copia en la biblioteca del Juez ponente.)

Puede verse también sobre el particular *Puerto Rico Committee Drafts Excellent Judicial Article,* 35 Journal of the American Judicature Society 122 (1951) ; Clark & Rogers, *The New Judiciary Act of Puerto Rico: A Definite Court Reorganization,* 61 Yale L.J. 1147 (1952) ; Snyder, *New*

---

*Puerto Rico,* Cambridge, Massachusetts, Harvard U. Press, 1969; traducción española titulada *La Modernización de Puerto Rico,* Río Piedras, Ed. U.P.R., 1972; Charles T. Goodsell, *The Administration of a Revolution,* Cambridge, Massachusetts, Harvard U. Press, 1965.

*Puerto Rico Judicial System is Modern and Efficient*, 36 Journal of the American Judicature Society 134 (1953); Shelden D. Elliott, *"Our Faith in Justice": Puerto Rico Shows the Way to Better Courts*, 42 American Bar Association Journal 25 (1956); Antonio Negrón García, *Puerto Rico Updates its Courts*, 58 Journal of the American Judicature Society 350 (1975); Fanny Klein, *Federal and State Courts Systems*, Institute of Judicial Administration, Ballingher Pub. Co., 1977, págs. 156–163.

Desde luego, como toda institución humana, al pasar del tiempo se hace necesario revisarla y actualizarla. José Trías Monge, *El Sistema Judicial de Puerto Rico*, Río Piedras, Ed. U.P.R., 1978, pág. 157 y ss.; *Pueblo v. Morcelo Martínez*, 104 D.P.R. 20, 22 (1975).

El demandante fue nombrado Juez Superior en 27 de marzo de 1968 por un término de doce años a tenor con la Sec. 12 de la Ley de la Judicatura, 4 L.P.R.A. sec. 92. En 14 de junio de 1974 fue nombrado Director Administrativo de la Oficina de Administración de los Tribunales, a tenor con las disposiciones de la Sec. 25 de la Ley de la Judicatura de Puerto Rico, según enmendada por la Ley Núm. 70 de 14 de junio de 1974 (4 L.P.R.A. sec. 331). Desempeñó dicho cargo del 17 de junio de 1974 al 16 de octubre de 1977, un total de 40 meses.

Para el mes de marzo de 1980 el señor Gobernador tomó la posición de que el término de doce años por el cual había sido nombrado el juez demandante había expirado y designó a otra persona para sustituir en su cargo al juez demandante.

El juez demandante presentó en el Tribunal Superior una demanda de *injunction* en solicitud de que se detuviese la acción del señor Gobernador que le destituía de su cargo, ya que había que esperar que se venciesen los doce años por el cual había sido nombrado, para que tal acción del Gobernador fuese válida. Tuvo éxito en el Tribunal Superior y ante nos recurrieron los demandados en petición de revisión.

La Oficina de Administración de los Tribunales se creó mediante la Sec. 25 de la Ley de la Judicatura del año 1952 (4 L.P.R.A. sec. 331). Mediante la Ley Núm. 103 de 29 de junio de 1960 se añadió el siguiente párrafo a la citada Sec. 25 de la Ley de la Judicatura:

Si el nombramiento de Director Administrativo recayere en una persona que esté ocupando un cargo como Juez del Tribunal Superior al momento de extendérsele nombramiento, dicha persona así designada retendrá todos sus derechos al amparo de las disposiciones de la Ley Núm. 12, de 19 de octubre de 1954, según enmendada, conocida como Ley de Retiro de la Judicatura, y el tiempo en que actúe como Director Administrativo de los Tribunales se le acreditará como si hubiera servido como Juez Superior.

Se observará que el propósito de ese párrafo fue establecer que si un juez era nombrado Director, se le extenderían en ese cargo los beneficios de retiro como juez. Lo relativo a la acreditación del tiempo, naturalmente lo que quería añadir es que el tiempo servido como Director se le acreditará *al retiro* como si hubiese servido de Juez Superior. El propósito *no* fue establecer que el tiempo servido como Director Administrativo de los Tribunales *redujese* el término del juez que aceptase ser Director Administrativo. El propósito fue favorecer al juez que aceptase el cargo administrativo, no penalizarlo por ello.

Que ese fue el propósito legislativo surge de la Ley Núm. 42 de 29 de mayo de 1964, que enmienda ese párrafo disponiendo expresamente que la referencia al tiempo servido es "para fines de retiro", y añade que ". . . el tiempo en que actúe como Director Administrativo de los Tribunales se le acreditará para fines de retiro como si hubiera servido como Juez Superior".

Dicha Ley Núm. 42, adicionó, además, el siguiente párrafo:

Si mientras ocupare el cargo de Director Administrativo dicha persona fuere nuevamente nombrada para ocupar un

cargo de Juez Superior, recibirá en su nueva posición aquel sueldo que le habría correspondido si hubiera continuado ininterrumpidamente en su anterior cargo de Juez Superior, y, por tanto, el tiempo que sirvió como Director Administrativo le será acreditado como servido en calidad de Juez Superior.

Mediante la Ley Núm. 70 de 14 de junio de 1974, se enmendó nuevamente el texto de la Sec. 25 de la Ley de la Judicatura. El último párrafo de dicha sección ahora dispone como sigue. Lo copiamos íntegro por razón de objetividad y porque contiene una cláusula que es vital para la interpretación de la ley y para la resolución de este caso. Dice dicho párrafo:

Si el nombramiento de Director Administrativo recayere en una persona que esté ocupando un cargo como Juez del Tribunal de Primera Instancia de Puerto Rico, dicha persona así designada, retendrá a *todos* los fines pertinentes, su *cargo,* condición y derechos de Juez mientras desempeña las funciones de Director Administrativo. Disponiéndose, que tal designación conllevará un relevo total y absoluto, y un impedimento en la realización de cualesquiera funciones judiciales o de otras índoles que emanen de la condición de Juez, las cuales quedarán suspendidas mientras se desempeñe como Director Administrativo de los Tribunales. Durante tal período devengará el sueldo correspondiente al cargo de Director Administrativo o el correspondiente a su cargo de Juez, de los dos, el mayor y, una vez cese en el mismo, recibirá aquel sueldo que le habría correspondido si hubiera continuado las funciones ininterrumpidamente en su cargo de Juez del Tribunal de Primera Instancia. *Tal designación no afectará el transcurso del término de nombramiento correspondiente al cargo de Juez del Tribunal de Primera Instancia que ostente,* ni los derechos al amparo de las disposiciones de la Ley de Retiro de la Judicatura, secs. 233 a 246 de este título. El tiempo en que actúe como Director Administrativo de los Tribunales se le acreditará para fines de retiro. (Énfasis suplido.)

De la Exposición de Motivos de la Ley Núm. 70 de 14 de junio de 1974 surge que el texto copiado obedece a un Informe sometido el 21 de enero de 1974 por la Comisión para Estudio

de los Tribunales al Consejo sobre la Reforma de Justicia, en el que se recomienda que cuando un juez sea nombrado Director, dicho magistrado retenga su cargo y condición de juez.

Surge, además, que la Asamblea Legislativa aprobó la enmienda, entre otras, para hacer más atractivo para los jueces el cargo de Director, al no conllevar una renuncia o desvinculación de la judicatura. De lo anterior se colige que el objetivo principal de la enmienda fue que los jueces retuvieran su *status* como tales.

El texto citado, además de establecer que un juez nombrado Director conserva su cargo, condición y derechos de juez, expresamente dispone que el nombramiento de Director "no afectará el transcurso del término de nombramiento *correspondiente al cargo de Juez*" ni sus derechos de retiro. (Énfasis suplido.)

La determinación de las cuestiones ante nos, nos lleva a aplicar las reglas generales de hermenéutica contenidas en nuestro Código Civil, que es nuestro Derecho supletorio.

"Las palabras de una ley deben ser generalmente entendidas en su más corriente y usual significación, sin atender demasiado al rigor de las reglas gramaticales, *sino al uso general y popular de las voces.*" (Énfasis suplido.) Código Civil, Art. 15. (31 L.P.R.A. sec. 15.)

"Cuando las palabras de una ley son dudosas, su sentido debe ser buscado por el examen y comparación de las frases dudosas con otras palabras y sentencias que les estén relacionadas, en el orden de una buena investigación, para llegar a su verdadero significado." Código Civil, Art. 17. (31 L.P.R.A. sec. 17.)

"Las leyes que se refieren a la misma materia o cuyo objeto sea el mismo, deben ser interpretadas refiriendo las unas a las otras, por cuanto lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte dudoso en otro." Código Civil, Art. 18. (31 L.P.R.A. sec. 18.)

"El medio más eficaz y universal para descubrir el verdadero sentido de una ley cuando sus expresiones son dudosas, es considerar la razón y espíritu de ella, o la causa o motivos que indujeron al poder legislativo a dictarla." Código Civil, Art. 19. (31 L.P.R.A. sec. 19.)

A tenor con lo anterior, debemos buscar el significado corriente, usual y popular de la palabra clave en la expresión legislativa que estamos examinando. En el *Diccionario de la Lengua Española*, 19na ed., 1970, aparecen 9 acepciones de la palabra "afectar". Las primeras 6 no aplican en el presente contexto. Las restantes 3 leen como sigue: "7. Menoscabar, perjudicar; influir desfavorablemente. 8. Producir alteración o mudanza en alguna cosa. 9. Imponer gravamen u obligación sobre alguna cosa, sujetándola el dueño a la efectividad de ajeno derecho."

En nuestro medio en Puerto Rico —cuyo conocimiento es determinante para el debido entendimiento de lo que quiso decir el Legislador— el uso común de la palabra "afectar" es el sétimo, esto es, el que implica *menoscabar, perjudicar o influir desfavorablemente.*

En el presente contexto, las primeras dos acepciones del sétimo significado son las realmente aplicables. Al sustituirlas por la palabra "afectar" en la expresión que examinamos, podemos determinar su verdadero sentido: el nombramiento de un juez como Director no afectará, esto es, *no menoscabará* ni perjudicará el transcurso del término de doce años por el cual fue nombrado el juez demandante. Esa expresión "no afectará", significa que el término servido por el juez como Director Administrativo no se le rebajará del término de doce años de su incumbencia como juez. Así es como se cumple con la Ley, no afectándole o menoscabándole ni perjudicándole en su término *judicial* de doce años. De otro modo, se estaría vulnerando la Sec. 12 de la Ley de la Judicatura, 4 L.P.R.A. sec. 92, la cual dispone que todo *juez* será nombrado y desempeñará su cargo por un término de doce años.

Como puede verse, el propósito fue ampliar los beneficios como medio de atracción y no concuerda ese esquema con la noción de que los beneficios anteriores se reduzcan, como lo sería el que se disponga que el término *administrativo* de servicio como Director se incluya en el término *judicial* de incumbencia como juez. La intención fue adicionar, y no privar de derechos o beneficios que anteriormente se disfrutaban.

Esa protección de la judicatura y de la independencia judicial se sigue manifestando en legislación posterior de la Asamblea Legislativa de Puerto Rico. Así, por ejemplo, la Ley Núm. 85 de 28 de junio de 1978 (16 L.P.R.A. sec. 3017a), dispone que si el nombramiento de Miembro de la Junta Revisora Electoral recayere sobre un juez, dicha persona retendrá, a todos los fines pertinentes, su cargo, condición y derechos de juez mientras desempeña las funciones de Miembro de la Junta Revisora.

En esta reciente legislación del año 1978, para que no hubiese la menor duda, la Asamblea Legislativa se tomó la precaución de expresar en la citada sección que "Al retornar a su cargo de Juez comenzará a correr el término que le restaba al momento de ser nombrado Miembro de la Junta Revisora". Véase en ese mismo sentido el Informe de la Comisión de Gobierno de la Cámara de Representantes sobre la citada Ley Núm. 85 de 1978. Esa enmienda o aclaración es lo que se llama la aclaración auténtica, pues no la hace un juez ni se hace a propuesta de los tratadistas, sino que la hizo el propio organismo legislativo, fuente primaria de la ley escrita. Albaladejo, *Compendio de Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1976, pág. 29; *Collazo Cartagena* v. *Hernández Colón*, 103 D.P.R. 870, 874 (1975).

Las alegaciones hechas en torno a este caso, en el sentido de que el Primer Ejecutivo está exento de la revisión judicial, son contrarias a toda la tradición del Derecho constitucional nuestro y son inconsistentes con el concepto de gobierno constitucional, concepto que implica gobierno por poderes limi-

tados. Dicho concepto no reconoce funcionario alguno que sea *legibus solutus,* superior a la ley. No lo reconocía ni el constitucionalismo antiguo ni lo reconoce el constitucionalismo moderno. La idea medieval de que el gobernante está sujeto a la ley fue recogida y reivindicada por el Derecho común. Como consecuencia de las crisis constitucionales de Inglaterra del siglo 17, dicha idea quedó definitivamente establecida. De ahí pasó a nuestras constituciones. ([2])

Aunque lo haya dicho antes, como el asunto va a la médula de estas cuestiones, parece útil insistir. El principio de la separación de poderes representa la concretización jurídica de una teoría de gobierno. Esta teoría de los gobiernos "divididos" o "mixtos", como también se le conoce, es una valiosa defensa contra la tiranía y es mucho más antigua que la Constitución de los Estados Unidos y que los escritos de los teóricos políticos de los siglos 17 y 18 que los autores de la Constitución americana conocían tan bien.

La Constitución de la Roma republicana ofrece un ejemplo notable de una cuidadosa separación de poderes. Discusiones del tema se encuentran en Aristóteles (Política), en Platón (Las Leyes) y en Polibio (Historias, Libro VI). El influjo del análisis de Polibio ha llegado hasta el pensamiento moderno. ([3]) En Inglaterra lo discute en 1583, ya con relación al Derecho constitucional inglés, Sir Thomas Smith (De República Anglorum). ([4]) El republicano Harrington, en su *Oceana* (1656) lo trata extensamente.

---

([2]) C. H. McIlwain, *Constitutionalism, Ancient and Modern,* New York, Great Seal Books, 1947; Sir W. Holdsworth, *A History of English Law,* ed. 1945, reimpreso en 1966, T. V, pág. 423 y ss. y T. VI, págs. 3–122; R. Pound, *The Spirit of the Common Law,* Boston, Marshall Jones Co., 1921, Cap. 3.

([3]) Influyó en Cicerón y en pensadores de la Edad Media como Marsilio de Padue y Santo Tomás de Aquino; y en Locke y Montesquieu, entre los modernos.

([4]) Allen, *A History of Political Thought in the Sixteenth Century,* 1928, pág. 262.

Las fuentes inmediatas que sobre esto inspiraron a los padres de la Constitución americana fueron Locke, *Second Treatise of Government* (1690) y especialmente Montesquieu, *El Espíritu de las Leyes*, Libro XI (1748), a quien Madison llamó "el oráculo que siempre se consulta sobre estos asuntos", *The Federalist* No. 47 (1788). En la formulación americana de la doctrina de separación de poderes también influyó Blackstone, *Commentaries on the Laws of England* (1765 y ediciones siguientes), debido a su gran influjo sobre la profesión legal americana durante el primer siglo de ésta. Pound, *The Formative Era of American Law* (1938). Para excelentes discusiones de la doctrina, véase el capítulo "The Separation of Powers: False and True" en Finer, *The Theory and Practice of Modern Government*, edición revisada 1960, pág. 94; Friedrich, *Constitutional Government and Democracy*, ed. rev. 1950, pág. 173, y Sharp, *The Classical American Doctrine of "the Separation of Powers"*, 2 U. Chi. L. Rev. 385 (1935).

Hoy día está reconocido universalmente por los tribunales y por los tratadistas que la separación de poderes no es completa ni absoluta. ($^5$) Puede decirse que nadie pretendió que lo fuese. La imposibilidad práctica de lo contrario fue reconocida por sus expositores principales y por los propios padres de la Constitución de los Estados Unidos. Madison, *The Federalist* No. 47.

Como ejemplo de lo anterior en el sentido de que el Poder Ejecutivo está sujeto a la Constitución y a las leyes y de que

---

(5)*Banco Popular, Liquidador* v. *Corte*, 63 D.P.R. 66, 70 (1944); *Miffitt* v. *Statler Hilton, Inc.*, 248 A.2d 581, 583 (1968); *Hobson* v. *Hansen*, 265 F.Supp. 902, 915 (1967); *Hill* v. *Relyea*, 216 N.E.2d 795, 798 (1966); *David* v. *Vesta Co.*, 212 A.2d 345, 357 (1965); *United States* v. *Solomon*, 216 F.Supp. 835, 840 (1963); *Dickson* v. *Saiz*, 308 P.2d 205, 211 (1957); *In re Opinion of the Justices*, 64 A.2d 169, 172 (1949); *Parker* v. *Riley*, 113 P.2d 873, 877 (1941); K. C. Davis, *Administrative Law Treatise*, St. Paul, Minnesota, West Publishing Co., 1958, Vol. 1, sec. 1.09; L. L. Jaffe, *Judicial Control of Administrative Action*, Boston, Little, Brown and Co., 1965, pág. 29, y Sharp, artículo citado, 2 U. Chi. L. Rev. 385 (1935).

no hay funcionario *legibus solutus* en nuestro sistema de gobierno, véanse *Marbury* v. *Madison,* 1 Cranch 137 (1803); *Humphrey's Executor* v. *United States,* 295 U.S. 602 (1935); *Youngstown Co.* v. *Sawyer,* (el "Steel-Seizure Case") 343 U.S. 579 (1952); *Powell* v. *McCormack,* 395 U.S. 486 (1969); *United States* v. *Nixon,* 418 U.S. 683, 703–707 (1974); *Jiménez* v. *Reiley,* 30 D.P.R. 626 (1922); *Romero Moreno* v. *Gore, Gobernador,* 46 D.P.R. 408 (1934) y *Santa Aponte* v. *Srio. del Senado,* 105 D.P.R. 750, 759–760 (1977).

La Constitución de Puerto Rico le impone como primer deber al Gobernador cumplir él la ley, y como segundo deber, hacerla cumplir. Art. IV, Sec. 4.

Como puede verse, la legislación patria que antes hemos reseñado demuestra una genuina preocupación por parte de la Asamblea Legislativa por sostener y defender la independencia judicial en Puerto Rico.

En nuestro sistema, las dos ramas políticas son la Legislativa y la Ejecutiva. Sus titulares son electos y tienen respetabilísimas funciones que llevar a cabo. Pero, por otro lado, la realidad es que normalmente ambas ramas están bajo el control de un partido político, el de la mayoría.

Como una mayoría puede ser virtuosa y observadora de la Ley, pero como también puede ser arbitraria e irrespetuosa de la Ley, la Constitución provee el sistema de pesos y contrapesos, para garantizar así libertades de los ciudadanos. Es la Rama Judicial la que en esos casos, actuando imparcialmente, interpreta y aplica la Constitución y la Ley, para así garantizar a los ciudadanos de todas las ideologías políticas y de toda condición económica y social, sus derechos y libertades.

Para que la democracia sea compatible con la libertad, aquélla tiene que contener como uno de sus elementos necesarios, el acuerdo de que vamos a estar en desacuerdo. Porque si, en ausencia de una Constitución o en violación de ella, la mayoría, mediante su control del gobierno, negase a la mino-

ría su derecho a expresarse y a funcionar políticamente, habría democracia en el estricto sentido de la palabra (gobierno por la mayoría), pero no habría libertad. Las Constituciones de Puerto Rico y de los Estados Unidos contienen ese elemento en su garantía de la libertad de palabra y de reunión.

En ausencia de una Rama Judicial competente, preocupada e independiente se desvanecerían todas las libertades que aparecen garantizadas en la Constitución y en las leyes. De ahí la importancia de la independencia judicial. Ésta es imprescindible para que todo el país, todos los ciudadanos, se sientan razonablemente seguros en sus derechos, en sus hogares y en sus trabajos.

Si bien es cierto que la Sec. 10 del Art. VI de la Constitución dispone que no se prorrogará el término de un funcionario público después de su nombramiento, esa no es la situación de autos. Aquí no se trata de prorrogar o extender el término de un funcionario público (el juez demandante), sino de protegérselo; de evitar que se lo acorten. El Juez demandante, quien ejercía el cargo de Director Administrativo de los Tribunales, tiene derecho a esa protección; protección que no tiene como propósito principal la protección de un individuo, sino la protección de los principios fundamentales de la inamovilidad e independencia judicial.

La independencia de la Rama Judicial y la inamovilidad de los jueces, excepto por las causas que determinan las leyes, son factores esenciales para el mantenimiento del imperio de la ley y del estado de derecho. Este concepto básico en nada reduce los poderes de las otras dos ramas del gobierno, la Legislativa y la Ejecutiva, siempre que éstas funcionen dentro de sus legítimos ámbitos constitucionales.

No hay confrontación; hay —o debe haber— colaboración hacia el bien común. Con respeto para todos, y especialmente para la Justicia y para el espíritu que informa nuestra Constitución y la Ley de la Judicatura, yo confirmaría la sentencia recurrida.