EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| German J. Brau<br>Demandante<br><br>v.<br><br>E.L.A de Puerto Rico, et als.<br>Demandados Recurridos<br><br>_____<br><br>Asociación Puertorriqueña de<br><br>la Judicatura, representada<br>por su Presidenta<br>Hon. Elizabeth Linares<br>Peticionaria<br><br>v.<br><br>E.L.A de Puerto Rico, et als.<br><br>Demandados Recurridos | Certificación<br><br>2014 TSPR 26<br><br>190 DPR ____ |

Número del Caso: CT-2013-21


Fecha: 21 de febrero de 2014

Certificación procedente del Tribunal de Primera Instancia,
Sala de San Juan


Abogado de la Parte Peticionaria:

                Lcdo. Hiram Sánchez Martínez
                Lcdo. Manuel Martínez Umpierre


Abogados de la Parte Recurrida:

                Lcdo. Juan Marqués Díaz
                Lcda. Yahaira De La Rosa Algarín

Oficina de la Procuradora General:

                Lcda. Margarita Mercado Echegaray
                Procuradora General



Materia: Derecho Constitucional – Constitucionalidad de la Ley 162-2013
sobre sistema de retiro de la judicatura.


Este documento constituye un documento oficial del Tribunal
Supremo que está sujeto a los cambios y correcciones del proceso
de compilación y publicación oficial de las decisiones del
Tribunal. Su distribución electrónica se hace como un servicio
público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |
|---|---|
| Germán J. Brau<br>    Demandante<br><br>        v.<br><br>E.L.A. de<br>Puerto Rico, et als.<br>        Demandados recurridos<br>_____<br><br>Asociación Puertorriqueña de<br>la Judicatura, representada<br>por su Presidenta Hon.<br>Elizabeth Linares<br>    Peticionaria<br><br>        v.<br><br>E.L.A. de<br>Puerto Rico, et als.<br>        Demandados recurridos | CT-2013-021 |

Opinión del Tribunal emitida por el Juez Presidente señor HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 21 de febrero de 2014.

En esta ocasión, tenemos el deber ineludible de evaluar la validez de la reforma al Sistema de Retiro de la Judicatura aprobada mediante la Ley Núm. 162 de 24 de diciembre de 2013 (Ley Núm. 162-2013). El análisis de esa legislación -la cual podría afectar a todos los jueces en funciones, retirados y a los que se nombren en un futuro- requiere un ejercicio ponderado y reflexivo de este Tribunal. Aunque esta controversia nos impone la tarea delicada de pasar juicio sobre nuestro sistema de retiro, se trata de un evento histórico que requiere que cumplamos con nuestro deber primordial de proteger celosamente la Constitución, como lo juramos hacer el día que asumimos nuestros cargos. Además,

tenemos la oportunidad de reafirmar los postulados más básicos de nuestro sistema democrático de gobierno. En esencia, el asunto que hoy tenemos ante nuestra consideración nos obliga a examinar minuciosamente las fronteras de la doctrina de separación de poderes y la independencia judicial en nuestro ordenamiento jurídico.

Examinadas las disposiciones de la ley íntegramente, junto con la normativa constitucional aplicable, validamos la reforma más significativa que se ha hecho al Sistema de Retiro de la Judicatura. Ello significa que los jueces nombrados por primera vez a partir del 1 de julio de 2014 participarán del Programa Híbrido que establece la Ley Núm. 162-2013 y los jueces nombrados por primera vez entre el 24 de diciembre de 2013 y el 30 de junio de 2014 tendrán como tope máximo de su pensión el 60% del sueldo más alto devengado como juez, según dispone la reforma legislada. Por otra parte, basado en el mandato constitucional, se mantendrá inalterado el derecho que tienen los jueces nombrados en o antes del 23 de diciembre de 2013 sobre sus pensiones de retiro. De este modo, armonizamos la ley con los postulados de nuestra Constitución y los principios que encarnan nuestro sistema republicano de gobierno.

I.

**A. _Proyecto de la Cámara 1595 original_**

El 19 de diciembre de 2013, comenzó una sesión extraordinaria convocada por el Gobernador, Hon. Alejandro García Padilla, para atender, entre otros asuntos, una reforma al Sistema de Retiro de la Judicatura del Estado

Libre Asociado de Puerto Rico. A esa fecha, el proyecto presentado por la administración, Proyecto de la Cámara 1595 (P. de la C. 1595), contenía una reforma que aplicaría únicamente a los jueces que fueran nombrados por primera vez a partir del 1 de julio de 2014. Específicamente, el título del proyecto expresaba que el propósito de la medida era:

> efectuar cambios **prospectivos** en el esquema legal aplicable al Sistema de Retiro de la Judicatura y establecer un Programa Híbrido de beneficio definido y contribución definida que habrá de resultar aplicable a **futuros** jueces del Tribunal General de Justicia del Estado Libre Asociado de Puerto Rico, con el fin de brindarle mayor estabilidad fiscal al Sistema de Retiro de la Judicatura de Puerto Rico y disminuir las deficiencias actuariales que actualmente afronta; y para otros fines relacionados.[1]

Consecuentemente, la Exposición de Motivos establecía que:

> esta Asamblea Legislativa reconoce que cualquier reforma a las pensiones del sistema de retiro de los jueces y juezas debe ser de naturaleza **prospectiva** para aquellas personas que sean nombradas por primera vez a un cargo como juez o jueza en el Tribunal General de Justicia del Estado Libre Asociado de Puerto Rico a partir de la fecha de efectividad de esta ley. De esta forma, se evita que la Judicatura esté sujeta a represalias, presiones y a situaciones de indebida intervención, contrarias a los principios de independencia judicial y separación de poderes.[2]

Además, en esta se expusieron ampliamente las implicaciones de carácter constitucional que debían considerarse a la hora de reformar el Sistema de Retiro de la Judicatura. A esos efectos, la Exposición de Motivos del proyecto original establecía que:

---

[1] P. de la C. 1595, según radicado el 19 de diciembre de 2013 (Énfasis suplido).

[2] Íd. (Énfasis suplido).

El sistema de retiro para los jueces que forman parte del Tribunal General de Justicia del Estado Libre Asociado de Puerto Rico es de estirpe constitucional, pues encuentra su base en la Sección 10 del Artículo V de la Constitución. Esta sección dispone que: "la Asamblea Legislativa establecerá un sistema de retiro para los jueces, retiro que será obligatorio cuando hubieren cumplido setenta años de edad". Art. V, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1. La Asamblea Constituyente plasmó de esta manera una de las garantías a los principios de independencia judicial y separación de poderes. García Martínez v. Gobernador, 109 D.P.R. 294, 297-298 (1979). El Presidente de la Comisión de la Rama Judicial de la Asamblea Constituyente, el delegado Ernesto Ramos Antonini, expresó que "[l]a independencia del poder judicial, se garantiza… mediante [distintas] características que contiene el proyecto[;] [entre éstas, la que] establece que la Legislatura de Puerto Rico aprobará un sistema de retiro para los jueces. Esto tiende a dar un sentido de estabilidad a los jueces en el desempeño de sus funciones, tan delicadas en nuestra sociedad". Diario de Sesiones de la Convención Constituyente de Puerto Rico 452-453 (1961).

El principio de independencia judicial encuentra continuidad de propósito en las cláusulas de no reducción de salarios de las Secciones 10 y 11 del Artículo VI de la Constitución. Véase Diario de Sesiones, supra, pág. 453; La Nueva Constitución de Puerto Rico, Escuela de Administración Pública, Universidad de Puerto Rico 499 (1954); Negrón Soto v. Gobernador, 110 D.P.R. 664, 666 (1981). La Sección 10 dispone que: "ninguna ley prorrogará el término de un funcionario público ni disminuirá su sueldo o emolumentos después de su elección o nombramiento". Art. VI, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1. Por su parte, la Sección 11 establece que: "los sueldos del Gobernador, de los Secretarios de Gobierno, de los miembros de la Asamblea Legislativa, del Contralor y de los Jueces se fijarán por ley especial y, con excepción del sueldo de los miembros de la Asamblea Legislativa, no podrán ser disminuidos durante el término para el cual fueron electos o nombrados". Art. VI, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1. Véase, además, José Julián Álvarez González, La Asamblea Legislativa de Puerto Rico y las Pensiones de los Jueces del Tribunal Supremo: Reseña de un Conflicto con la Independencia Judicial, 56 Rev. Jur. U.P.R. 265, 298 (1987). El propósito común

de proteger la independencia judicial que tienen las citadas cláusulas y la Sección 10 del Art. V de la Constitución sobre el retiro de la judicatura sugiere que la protección contra la reducción de salarios pudiese ser de aplicación a los beneficios de los sistemas de retiro. *Id.* a la pág. 298.[3]

Según expresó el Gobernador al someter el proyecto, distinto a otras reformas de retiro para servidores públicos, la reforma del Sistema de Retiro de la Judicatura fue estructurada para que aplicara prospectivamente pues, "por tratarse de una rama gubernamental, la Constitución impide que se les deduzcan las compensaciones a los jueces que están en su puesto".[4]

Mediante el proyecto remitido por el Ejecutivo, los jueces nombrados a partir del 1 de julio de 2014 tendrían, en comparación con los jueces nombrados antes de esa fecha: un aumento de 8% a 12% en la aportación de cada participante al Sistema de Retiro; un aumento de 60 a 65 años en la edad de retiro; y un aumento de 8 a 12 años de servicio mínimo como juez requerido para poder acogerse al retiro. Además, se sustituía la base utilizada anteriormente para calcular la pensión, a saber, el sueldo más alto devengado como juez, por el promedio del sueldo devengado durante los últimos 5 años. Asimismo, los jueces nombrados por primera vez a partir de esa fecha cotizarían bajo un Programa Híbrido creado mediante la misma medida legislativa. Al acogerse al retiro, esos

---

[3] Íd.

[4] Doble vara en la extraordinaria: Intocable el retiro de los jueces en funciones, dice AGP. http://noticel.com/noticia/153203 /doble-vara-en-la-extraordinaria-intocable-el-retiro-de-los jueces-en-funciones-dice-agp.html (última visita el 22 de enero de 2014).

participantes recibirían una anualidad vitalicia que incluía un componente de beneficio definido y otro de contribución definida.[5]

Para esos jueces, el Programa Híbrido sustituía la posibilidad de recibir una pensión del 75% del sueldo más alto devengado como juez. La reforma también eliminaba el bono de verano, el bono de medicamentos y el aguinaldo de navidad. Por último, se cerraban las transferencias provenientes de otros sistemas de retiro por lo que al calcular la pensión no se daría crédito por otros servicios

---

[5] Las Secciones 4 y 5 del P. de la C. 1595, según presentado originalmente, cuyo lenguaje se mantuvo inalterado y se convirtieron en la Sección 3 de la Ley Núm. 162-2013, establecían la siguiente fórmula para calcular la anualidad vitalicia que recibirían los participantes del Programa Híbrido:

**Artículo 4-C. - Cálculo de Retribución Promedio para Nuevos Participantes.**

La retribución promedio de todo nuevo participante que ingrese por primera vez al Sistema a partir del 1 de julio de 2014, se calculará a base del promedio del sueldo del participante durante los últimos cinco (5) años de servicio. Este período de cinco (5) años será el período base.

**Artículo 4-D.-Anualidades para Nuevos Participantes.**

A.-Anualidad por Años de Servicios.-Los participantes que ingresen por primera vez al Sistema a partir del 1 de julio de 2014 y que formen parte del Programa Híbrido podrán acogerse al retiro a partir de la fecha en que cumplan sesenta y cinco (65) años de edad, hayan completado un mínimo de doce (12) años de servicios como juez y no hayan solicitado ni recibido el reembolso de sus aportaciones acumuladas. El importe de la anualidad que recibirán los participantes del Programa Híbrido al acogerse al retiro será el uno punto cinco por ciento (1.5%) de la retribución promedio, multiplicado por el número de años de servicios como juez del Tribunal General de Justicia.

prestados al Gobierno en cualquier otra capacidad que no fuera la de juez.

**Es decir, el proyecto remitido por el Ejecutivo no impactaba a los jueces en funciones ni a los ya retirados, pero modificaba sustancialmente las condiciones de retiro para los jueces nombrados por primera vez a partir del 1 de julio de 2014.** Precisamente, el proyecto disponía que la Ley entraría en vigor el 1 de julio de 2014 y aplicaría a "aquellas personas que a partir de tal fecha sean nombradas por primera vez a un cargo como juez del Tribunal General de Justicia del Estado Libre Asociado de Puerto Rico".[6] De hecho, incluía una cláusula derogatoria para que no se afectaran los derechos adquiridos y beneficios otorgados mediante otras leyes y reglamentos.[7]

El viernes, 20 de diciembre de 2013, se celebró una vista pública sobre esta medida. A esta comparecieron la Asociación Puertorriqueña de la Judicatura (Asociación de la Judicatura), la Administración de los Sistemas de Retiro de los Empleados de Gobierno y la Judicatura (Administración de los Sistemas de Retiro), el Banco Gubernamental de Fomento, el Departamento de Justicia, la Oficina de Administración de los Tribunales y la Oficina de Gerencia y Presupuesto, quienes presentaron sus respectivos comentarios.

En síntesis, las seis ponencias favorecían el proyecto por su aplicación a jueces nombrados en el futuro.

---

[6] Sección 16, P. de la C. 1595, según presentado.

[7] Sección 14 del P. de la C. 1595 según presentado originalmente, la cual se mantuvo inalterada y se convirtió en la Sección 18, Ley Núm. 162-2013.

Entendieron que, de esta forma, se cumplía con el mandato constitucional de que cualquier reforma a este sistema tenía que ser prospectiva. La Asociación de la Judicatura expresó que:

> esta acción que se toma por el gobierno para atender la situación fiscal de los sistemas de retiro públicos, se hace a nuestro entender presentando estos proyectos para modificar de forma **prospectiva** el sistema de retiro de la Judicatura, demuestra que estamos en una sociedad de ley y orden donde los representantes de nuestro pueblo, elegidos por éstos para administrar el gobierno, conocen y respetan la Constitución.[8]

De igual forma, la Administración de los Sistemas de Retiro concluyó que la medida: "representa un ejercicio en la dirección correcta para reformar el Sistema de Retiro de la Judicatura, toda vez que modifica los beneficios de los futuros participantes del Sistema".[9] Por su parte, el Banco Gubernamental de Fomento indicó que: "no se opone a que la Asamblea Legislativa ausculte cambios adicionales a dicho Sistema que sean actuarialmente recomendables y que caigan dentro de los límites constitucionales detallados en la Exposición de Motivos".[10] Igualmente, el Departamento de Justicia brindó su anuencia al proyecto al exponer que: "en vista de que esta medida legislativa se atiene a la normativa antes expuesta al disponer su vigencia a partir del 1 de

---

[8] Ponencia de la Asociación Puertorriqueña de la Judicatura sobre el P. de la C. 1595, págs. 11-12. (Énfasis en el original).

[9] Ponencia de la Administración de los Sistemas de Retiro de los Empleados de Gobierno y la Judicatura sobre el P. de la C. 1595, pág. 5.

[10] Ponencia del Banco Gubernamental de Fomento sobre el P. de la C. 1595, pág. 2.

julio de 2014, sin afectar el retiro garantizado constitucionalmente a los actuales jueces y ex jueces, el Departamento de Justicia no presenta objeción legal alguna".[11] En su Ponencia, el Departamento de Justicia destacó que:

> cuando nos encontramos ante proyectos de ley como el presente, debemos tener en cuenta que los contornos legales de las pensiones judiciales están sujetos a consideraciones constitucionales ulteriores. En específico, lo establecido en las citadas cláusulas constitucionales de no reducción de salarios del Artículo VI, Secciones 10 y 11 de la Constitución, y los principios de independencia judicial al amparo del Artículo V, Sección 10 de la Constitución.[12]

Además, fundamentándose en un informe de la American Bar Association, sostuvo que "la falta de autosuficiencia e independencia del Sistema de Retiro de la Judicatura, a diferencia de los otros sistemas de retiro público, no parece ser, de por sí, criterio suficiente para validar una reducción de beneficios".[13] Por su parte, la Oficina de

---

[11] Ponencia del Departamento de Justicia sobre el P. de la C. 1595, pág. 7.

[12] Íd., pág. 5.

[13] Íd., pág. 7. El informe citado de la American Bar Association al que hace referencia la Ponencia del Departamento de Justicia, Standards Relating to Court Organization, pág. 60 (1990), expresa al respecto que:

> *A judicial pension system must be largely underwritten by government. It cannot very easily be established on an actuarially sound basis unless the employer (state) contribution is very high. Most actuarially sound pension systems have a sizable proportion of relatively young people in the protected group and also contemplate that a substantial number of contributors will never receive benefits, because they leave the system for other employment before becoming eligible. These conditions are reversed in judicial pension*

Administración de los Tribunales respaldó las propuestas presentadas, las cuales eliminaban y reducían los beneficios a los futuros jueces y aumentaban su aportación al sistema, por entender que de esta forma se atendía el asunto legislado dentro del marco constitucional vigente.[14] Por otro lado, la Oficina de Gerencia y Presupuesto también presentó su endoso al Proyecto y concluyó que "esta Reforma aporta a la meta de obtener una estabilidad económica en nuestro país, y se demuestra solidaridad con las medidas de control fiscal y manejo de las finanzas que se han estado tomando".[15]

A raíz de esto, la Comisión de Asuntos Laborales y Sistemas de Retiro del Servicio Público y la Comisión de Hacienda y Presupuesto de la Cámara de Representantes rindieron al día siguiente un informe positivo sobre la medida junto con unas enmiendas incluidas en el entirillado electrónico.[16] Estas mantuvieron el carácter prospectivo de la reforma, pero propusieron que se eliminaran el bono de

---

*schemes, which cover a group of relatively older people, almost all of whom will remain in the system until the point of eligibility.*

[14] Ponencia de la Oficina de Administración de los Tribunales sobre el P. de la C. 1595, pág. 28.

[15] Ponencia de la Oficina de Gerencia y Presupuesto sobre el P. de la C. 1595, pág. 2.

[16] Cabe mencionar que las enmiendas incluidas en el entirillado incluían una sección para que, con el propósito de solventar su déficit de flujo de caja, el Sistema solicitara un estudio actuarial para determinar el monto de la aportación adicional que el Gobierno tendría que hacer al Sistema para evitar que el valor de los activos brutos proyectados sea, durante cualquier año fiscal subsiguiente, menor a veinte millones de dólares ($20,000,000). La validez de esta disposición no está en controversia.

verano, el bono de medicamentos y el aguinaldo de navidad

para todos los participantes del sistema.

**B. *Proyecto de la Cámara 1595 enmendado en la Cámara de Representantes***

Así las cosas, el sábado 21 de diciembre de 2013 la

Cámara de Representantes de Puerto Rico consideró el P. de la

C. 1595, le introdujo unas enmiendas a viva voz y lo aprobó.

Según se desprende del Diario de Sesiones, el análisis sobre

las enmiendas fue el siguiente:

> SR. HERNÁNDEZ LÓPEZ: Señor Presidente, que se aprueben dichas enmiendas.
>
> SR. PRESIDENTE (PERELLÓ BORRÁS): Los que estén a favor servirán decir que sí. En contra no. Aprobado.
> Quiero destacar el voto en contra del compañero Torres Yordán y Varela Fernández.
>
> SR. HERNÁNDEZ LÓPEZ: Señor Presidente.
>
> SR. PRESIDENTE (PERELLÓ BORRÁS): Que se apruebe la medida según enmendada, señor Portavoz.
>
> SR. HERNÁNDEZ LÓPEZ: Señor Presidente, vamos a solicitar la aprobación de la medida según ha sido enmendada.
>
> SR. PRESIDENTE (PERELLÓ BORRÁS): Los que estén a favor servirán decir que sí. En contra no. Aprobado.
> Ya dejamos claro a los Representantes que están en contra de la enmienda.
>
> SR. HERNÁNDEZ LÓPEZ: Hay enmiendas en el título, solicitamos sean aprobadas dichas enmiendas.
>
> SR. PRESIDENTE (PERELLÓ BORRÁS): Si no hay objeción, se aprueban las enmiendas al título.[17]

Las enmiendas introducidas alteraron considerablemente

las pensiones de los jueces nombrados por primera vez "en o

antes del 30 de junio de 2014". También se modificó la fecha

---

[17] Diario de Sesiones del P. de la C. 1595 del 21 de diciembre de 2013.

de vigencia de la ley para hacerla efectiva inmediatamente después de su aprobación. Particularmente, la Cámara de Representantes añadió las siguientes modificaciones: estableció una pensión por retiro que no excederá del 60% del sueldo más alto devengado como juez para toda persona que sea nombrada en o antes del 30 de junio de 2014; aumentó la aportación individual de 8% a 10% para estos últimos; incluyó una ventana para que los participantes que cualifiquen para solicitar una pensión por retiro en o antes del 1 de julio de 2015 puedan recibir una pensión mayor, pero que en ningún caso excederá el 75% del sueldo más alto devengado como juez; y se eliminaron los bonos concedidos mediante leyes especiales para todos los participantes del sistema.

A su vez, las enmiendas mantuvieron el Programa Híbrido para todas aquellas personas que sean nombradas como juez a partir del 1 de julio de 2014. Es decir, a partir de esa fecha se elimina la posibilidad de obtener una pensión de hasta un 60% del sueldo más alto devengado como juez y se sustituye por el Programa Híbrido.

El título sólo sufrió cambios de estilo, pero mantuvo la explicación de que la ley es para efectuar cambios prospectivos al esquema legal aplicable al Sistema de Retiro de futuros jueces. También se mantuvo inalterada la cláusula derogatoria que asegura que no se afectarán los derechos adquiridos y beneficios otorgados mediante otras leyes y reglamentos.[18] Además, durante todo el proceso de aprobación tampoco sufrió cambios una cláusula de separabilidad que

---

[18] Sección 18, Ley Núm. 162-2013.

dispone que "si cualquier párrafo, artículo o parte de esta Ley fuera declarada inconstitucional por un tribunal con competencia y jurisdicción, la sentencia dictada no afectará ni invalidará el resto de esta Ley, y su efecto se limitará al párrafo, artículo o parte declarada inconstitucional".[19] Sin discusión ulterior, el proyecto se refirió al Senado de Puerto Rico.

Tomamos conocimiento judicial de que el 22 de diciembre de 2013, la Directora Administrativa de los Tribunales, Hon. Sonia I. Vélez Colón, envió una carta al senador Hon. José R. Nadal Power en la cual consignó su oposición a las enmiendas aprobadas en la Cámara de Representantes porque podrían violar el principio de independencia judicial. Específicamente, expresó que:

> en la Rama Judicial somos conscientes de la necesidad de atender el déficit actuarial que enfrenta el Sistema de Retiro de la Judicatura y, cónsono con ello, valoramos el interés por identificar medidas conducentes a proveer solvencia al sistema. También reconocemos la facultad de la Asamblea Legislativa para introducir modificaciones al Sistema de Retiro de Jueces y Juezas con miras a procurar su fortalecimiento, solvencia y continuidad. Sin embargo, reiteramos que cualquier enmienda a esos fines tiene que estar enmarcada en las limitaciones que establece la Constitución como parte del sistema de frenos y contrapesos establecido para dar concreción al principio de separación de poderes.[20]

No obstante, la Directora Administrativa de los Tribunales exhortó a dicho cuerpo a que pospusiera la

---

[19] Sección 19, Ley Núm. 162-2013.

[20] Carta de la Directora Administrativa de los Tribunales, Hon. Sonia I. Vélez Colón, al senador Hon. José R. Nadal Power del 22 de diciembre de 2013.

aprobación del P. de la C. 1595 hasta que se discutiera el asunto a profundidad o que se revirtiera el proyecto a la versión original remitida por el Primer Ejecutivo. A esos efectos, en su comunicación indicó que:

> hacemos un llamado a esta comisión legislativa y al Senado de Puerto Rico para que se abstenga de aprobar esta medida legislativa y que posponga su consideración o, en la alternativa, que la modifique para ajustarla a la normativa constitucional aplicable, conforme lo hacía la versión radicada originalmente. Como de costumbre, la Rama Judicial está disponible para participar de un diálogo sosegado y abierto que nos permita identificar alternativas cónsonas con nuestro ordenamiento constitucional.[21]

Por su parte, el Gobernador, a la luz de los cambios aprobados por la Cámara de Representantes en la legislación propuesta por él, afirmó que sabía que habían:

> algunas reservas con algunas enmiendas que se han hecho en cuanto a la aplicación retroactiva de esa medida, y fue una enmienda que se hizo en la Legislatura, no estaba en el proyecto que enviamos, y eso es algo que (hay que) mirar en detalle y salvar cualquier vicio constitucional.[22]

Así las cosas, el lunes, 23 de diciembre de 2013, la Comisión de Hacienda y Finanzas Públicas del Senado de Puerto Rico presentó su informe positivo sobre el P. de la C. 1595, recomendando su aprobación sin enmiendas. Según explica dicho informe, como parte del proceso de evaluación de esta medida legislativa, se consideraron las ponencias presentadas y resumidas anteriormente. Esta comisión concluyó que, tanto el

---

[21] Íd.

[22] Gobernador se distancia de objeciones al retiro de la Judicatura http://www.elnuevodia.com/gobernadorsedistanciadeobjecionesal retirodelajudicatura-1674227.html (última visita el 10 de febrero de 2014).

Programa Híbrido creado mediante el proyecto original, como las enmiendas hechas en el hemiciclo, son necesarias para efectuar cambios sustanciales al Sistema de Retiro aplicable a futuros jueces.[23]

Ese 23 de diciembre, el Senado de Puerto Rico aprobó el proyecto sin enmiendas. Un día después, el Gobernador lo firmó, convirtiéndolo en la Ley Núm. 162-2013. Según sus propios términos, la ley tiene vigencia inmediata, es decir, desde el 24 de diciembre de 2013.

## C. Trasfondo procesal del caso

Dos días después de aprobada la ley, el 26 de diciembre de 2013, el Hon. Germán J. Brau, Juez del Tribunal de Apelaciones, presentó la demanda del caso de autos contra el Estado Libre Asociado de Puerto Rico (ELA) y la Hon. Sonia I. Vélez Colón, en su carácter de Directora de la Oficina de Administración de los Tribunales.[24] Solicitó que se decretara la inconstitucionalidad de la Ley Núm. 162-2013 por ser contraria al Artículo VI, Secciones 10 y 11 de la Constitución de Puerto Rico, así como a los principios de independencia judicial y separación de poderes. Suplicó que se emitiera un *injunction* preliminar y permanente para prohibir su puesta en vigor.

---

[23] Informe positivo de la Comisión de Hacienda y Finanzas Públicas del Senado de Puerto Rico, pág. 13.

[24] En la demanda, el Hon. Germán J. Brau sostiene que incluyó a la Hon. Sonia I. Vélez Colón en representación de la Oficina de Administración de los Tribunales por ser la encargada de poner en vigor las normas relacionadas con los descuentos de nómina de los jueces y juezas para el pago de las aportaciones al sistema de retiro.

El 30 de diciembre de 2013, se presentó otra demanda por la Asociación de la Judicatura, corporación cuyos miembros son jueces activos del Tribunal de Primera Instancia y del Tribunal de Apelaciones, así como jueces jubilados. Peticionó que el tribunal dictara una sentencia declaratoria en la que decretara la inconstitucionalidad de la Ley Núm. 162-2013. Arguyó que esta afectaba a su matrícula que se compone del 60% de los jueces y juezas del Tribunal General de Justicia. También argumentó que la ley interfiere con la separación de poderes, atenta contra la cláusula del debido proceso de ley, viola la cláusula contra el menoscabo de obligaciones contractuales y disminuye los sueldos y emolumentos de los jueces y juezas, todo esto en violación a la Constitución.

Ese mismo día, la Asociación de la Judicatura presentó una petición de certificación intrajurisdiccional ante este Tribunal. Emitimos una Resolución en la cual, tras invocar la Regla de Necesidad,[25] certificamos el pleito por tratarse de una controversia constitucional de estricto derecho y alto interés público. Al respecto, indicamos que es innegable que la resolución del caso pueda afectar directamente los

---

[25] Sobre este particular, véase la Resolución de este Tribunal del 31 de diciembre de 2013. En una situación similar, la Corte Suprema de Nueva Jersey expresó que: "la regla de necesidad prohíbe la descalificación de toda la judicatura para atender un caso aun si existiera alguna percepción de que el resultado estará matizado por el interés personal. Debemos revisar esta controversia de importancia constitucional de manera justa e imparcial. Otras cortes han hecho lo mismo. No estamos haciendo nada distinto en esta ocasión". DePascale v. State, 47 A.3d 690 (N.J. 2012) (Traducción nuestra).

intereses de todos los jueces y juezas de este Tribunal.[26] No obstante, descargamos nuestra responsabilidad y señalamos que por más incómodo y antipático que sea, no claudicaríamos a nuestro deber constitucional de proveer a las partes demandantes un foro en el cual reclamar sus derechos. Íd. Por imperativo de esa regla, todos los jueces y juezas de este Tribunal hemos participado en la consideración de este caso. En dicho dictamen, también consolidamos la petición con la demanda presentada por el Hon. Germán J. Brau. Concedimos un término de 10 días para que las partes presentaran sus alegatos y ordenamos la celebración de una vista oral el 15 de enero de 2014.[27]

Oportunamente, los demandantes, Hon. Germán J. Brau y la Asociación de la Judicatura, y los demandados, el ELA representado por la Procuradora General, Hon. Margarita Mercado Echegaray, y la Oficina de Administración de los Tribunales presentaron sus respectivos alegatos. En síntesis, el Hon. Germán J. Brau sostiene que el esquema adoptado por la Constitución de Puerto Rico requiere que el Poder Judicial mantenga una posición independiente y que la situación económica de los jueces nunca sea afectada de manera retroactiva. Señala que ningún juez de este país gozaría de verdadera independencia si las Ramas Políticas de Gobierno

---

[26] Resolución del Tribunal Supremo de Puerto Rico emitida el 31 de diciembre de 2013.

[27] El 31 de diciembre de 2013, día en que emitimos esa Resolución, la Asociación Puertorriqueña de la Judicatura presentó una moción en auxilio de jurisdicción para que se paralizaran los efectos de la Ley Núm. 162-2013, por entender que, debido a su vigencia inmediata, el salario de los jueces y juezas se vería afectado. Denegamos esa solicitud.

tuvieran el poder de adoptar legislación para menoscabar su posición económica. Además, considera que la pensión es un emolumento de rango constitucional que forma parte de la compensación, por lo que esos beneficios no pueden ser reducidos de forma retroactiva para los jueces que están en funciones. Añade que la decisión del caso Dávila v. E.L.A., Civil Núm. 85-3821 (904), 86 S.T.S. 65 (1986), constituye un impedimento colateral para el Estado, quien fue parte demandada con un interés similar al que podría tener en esta ocasión. Esto, pues el tribunal expresó en su sentencia que una ley que reducía de forma retroactiva los beneficios de retiro de los jueces del Tribunal Supremo tanto incumbentes como jubilados, es inconstitucional por disminuir los beneficios y emolumentos provistos para un cargo judicial.

Por su parte, la Asociación de la Judicatura plantea que la reforma establecida en la Ley Núm. 162-2013 no tiene ningún dato o estudio actuarial que justifique las medidas. También enfoca sus argumentos en el principio de independencia judicial, el cual garantiza a la ciudadanía que los jueces y juezas emitirán sus fallos y decisiones a base de la más correcta interpretación del derecho, no a base de temores o represalias. Asimismo, sostiene que un aumento en las aportaciones de los jueces en funciones constituye una reducción de salario prohibida constitucionalmente. Añade que los participantes del Sistema de Retiro tienen un interés propietario de naturaleza contractual protegido por la garantía constitucional contra el menoscabo de obligaciones contractuales. Por último, señala que el Artículo 4, inciso

(c) de la ley contiene una clara invitación para que los jueces que cualifiquen se retiren en o antes del 1 de julio de 2015. Esto, pues si se retiran antes de esa fecha podrán recibir una pensión equivalente a un 75% de su sueldo, mientras que si se retiran después de esa fecha solo podrán recibir una pensión de hasta un 60% del sueldo. Advierte que esta disposición es altamente preocupante, al establecer un precedente peligroso que permitiría a cualquier administración de turno propiciar múltiples retiros de jueces.

La Asociación de la Judicatura también nos solicita que tomemos conocimiento de expresiones del Gobernador en las que afirma que la Constitución impide que se reduzcan las compensaciones de los jueces que están en sus puestos. Además, reitera que la posición de la Asociación de la Judicatura en la demanda y en su alegato es cónsona con la postura que exteriorizó en la vista pública que se llevó a cabo sobre el P. de la C. 1595, según presentado.

Por la parte demandada, la Hon. Sonia I. Vélez Colón, en su carácter oficial como Directora Administrativa de la Oficina de Administración de los Tribunales, expresa que la reforma al Sistema de Retiro de la Judicatura de la Ley Núm. 162-2013 contraviene la Constitución al aumentar la aportación individual de los jueces, reducir la pensión máxima a la cual pueden aspirar y eliminar beneficios a pensionados, pues disminuye los sueldos y emolumentos de los jueces que están en funciones. Alega que esto, a su vez, está reñido con el principio de independencia judicial. Destaca

que esta postura es consecuente con la esgrimida durante todo el proceso de aprobación del P. de la C. 1595.

Por su parte, el ELA y el Secretario de Justicia, representados por la Procuradora General, exponen que la Ley Núm. 162-2013 es constitucional de su faz y constituye un medio razonable y necesario para afrontar la crisis al Sistema de Retiro de la Judicatura. Alegan que, tanto del texto constitucional como de las discusiones de la Convención Constituyente, se colige que la prohibición relativa a la disminución del sueldo de los jueces no se extiende a proscribir medidas como la Ley Núm. 162-2013, que enmiendan la fórmula para computar la pensión de retiro y aumentan las aportaciones individuales de los jueces a los fines de salvaguardar la existencia del sistema. Señalan que, aunque la Constitución garantiza un sistema de retiro, este no es inalterable. También arguyen que cualquier efecto que el aumento en las aportaciones pueda tener en el sueldo de los jueces es indirecto y temporero, razón por la cual no infringe la protección contra disminuciones en el sueldo de los jueces ni atenta contra la independencia judicial. Por ello, concluyen que el estatuto no vulnera los preceptos de independencia judicial al no disminuir el sueldo bruto que por ley los jueces tienen derecho a recibir. A su vez, alegan que la ley mantiene incólume el derecho de los jueces a que se mantenga un sistema de retiro.

Cabe resaltar que el ELA limita su discusión a analizar la constitucionalidad de las Secciones 2, 3 y 10 de la Ley Núm. 162-2013, por entender que esas son las disposiciones

que enmiendan la fórmula de la pensión máxima de retiro y aumentan la contribución de los jueces en funciones. En ese sentido, expresan que los demandantes no tienen legitimación activa para cuestionar las disposiciones de la Ley Núm. 162-2013 que solo aplicarían a los participantes que ingresarán al sistema de retiro a partir del 1 de julio de 2014.

En su escrito, el ELA defiende la aplicación de la Ley Núm. 162-2013 a los jueces en funciones. Esto, en contradicción con la postura de la Rama Ejecutiva durante el proceso de vistas públicas del P. de la C. 1595 en su versión original. Expresan que "no estamos ante el supuesto de una aplicación retroactiva de un estatuto, debido a que los actuales pensionados continuarán recibiendo la pensión que han recibido hasta el momento".[28] Según su discusión, "un cambio en los términos de un sistema de retiro no se puede considerar una aplicación retroactiva de la ley, excepto en los casos en que se modifique una pensión ya devengada".[29]

Tras la presentación de los escritos, se celebró la vista argumentativa el 15 de enero de 2014. En su exposición, las partes demandantes enfatizaron la peligrosidad para la ciudadanía de permitir una violación a los principios de independencia judicial y separación de poderes. La Oficina de Administración de los Tribunales declaró sobre su posición como el ente encargado de poner en vigor la reforma. Finalmente, el ELA reiteró que el sueldo de los jueces no se afectaría porque la pensión no es parte del mismo.

---

[28] Alegato del ELA, págs. 33-34.

[29] Íd., pág. 34.

Concluida la vista oral, el caso quedó sometido ante nuestra consideración y estamos prestos a resolver.

II.

La controversia que está ante nuestra consideración nos invita a analizar varios asuntos de gran envergadura: la doctrina de autolimitación judicial, los principios de hermenéutica y los principios de separación de poderes e independencia judicial.

**A. Doctrina de autolimitación judicial y principios de hermenéutica**

Como es sabido, la Rama Judicial es la encargada de interpretar y aplicar la ley. Corraliza v. Bco. Des. Eco., 153 D.P.R. 161, 176 (2001). Esta función se encuentra limitada por la doctrina de autolimitación judicial que tiene su génesis en consideraciones constitucionales y prudenciales. Crespo v. Cintrón, 159 D.P.R. 290, 298 (2003); E.L.A. v. Aguayo, 80 D.P.R. 554, 596-597 (1958). Véase, además, R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, Universidad Interamericana de Puerto Rico, 1997, Vol. I, pág. 195. Esta doctrina busca evitar un trastoque en nuestro esquema constitucional de separación de poderes. E.L.A. v. Aguayo, supra. A su vez, permite que se mantenga el equilibrio necesario entre las Ramas de Gobierno. Íd.

La doctrina de autolimitación judicial aplica en aquellas situaciones en las que un tribunal es llamado a evaluar la validez constitucional de una pieza legislativa. En lo pertinente, la misma dispone que, cuando se cuestione

la validez de una ley, aun cuando se suscite una duda seria sobre su constitucionalidad, el tribunal primero decidirá si hay una interpretación razonable que permita soslayar la cuestión constitucional. E.L.A. v. Aguayo, *supra*, pág. 596.

Cónsono con lo anterior, en nuestro ordenamiento jurídico las leyes se presumen constitucionales hasta tanto un tribunal competente declare lo contrario. Caquías Mendoza v. Asociación de Residentes, 134 D.P.R. 181, 189 (1993). Por ello, los tribunales deben esforzarse por lograr interpretaciones congruentes y compatibles que adelanten la constitucionalidad de las mismas. Nadal v. Depto. Rec. Nat., 150 D.P.R. 715, 720-721 (2000).[30] Asimismo, los tribunales no considerarán el aspecto constitucional de una medida legislativa cuando se pueda atender el asunto mediante un análisis estatutario. Íd. Véase, además, P.P.D. v. Admor. General de Elecciones, 111 D.P.R. 199, 243 n. 32 (1981). Si interpretar de forma literal un estatuto levanta cuestiones constitucionales, los tribunales, en lo posible, deberán atemperarlo para evitar decretar su inconstitucionalidad. Nadal v. Depto. Rec. Nat., *supra*, pág. 721. De igual forma, es norma reiterada que cuando se cuestiona la validez de una ley o se suscita alguna duda sobre su constitucionalidad, los

---

[30] Para una discusión sobre estas normas de autolimitación judicial y de hermenéutica constitucional en la jurisdicción federal, véanse Almendarez-Torres v. U.S., 523 U.S. 224, 237-238 (1998); Public Citizen v. U.S. Dept. of Justice, 491 U.S. 440, 465-66 (1989); Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Const. Trades Council, 485 U.S. 568, 575 (1988); United v. Delaware & Hudson Co., 213 U.S. 366, 407-408 (1909); Hooper v. California, 155 U.S. 648, 657 (1895). Véase, además, R. H. Fallon, Jr., J. F. Manning, *et al.*, Hart and Wechsler´s, The Federal Courts and The Federal System, Foundation Press, 6ta Edición, págs. 68-80, 2009.

tribunales deben asegurarse que no existe otra posible interpretación razonable de la ley. Caquías Mendoza v. Asociación de Residentes, *supra*, pág. 188.

Por otra parte, los principios de hermenéutica de nuestro ordenamiento sirven de base cuando los tribunales están llamados a interpretar las leyes. Primeramente, se debe determinar si el lenguaje de la ley es simple y preciso en relación con la controversia. S.L.G. v. Solá-Moreno v. Bengoa Becerra, 182 D.P.R. 675, 691 (2011); González Hernández v. González Hernández, 181 D.P.R. 746, 763 (2011). De ser así, los tribunales deben sujetar su análisis a la acepción simple y clara del lenguaje, por entenderse que el texto de la ley representa la intención del legislador. Íd. Véase, además, Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14.

No obstante, ante un lenguaje confuso, el Artículo 7 del Código Civil, 31 L.P.R.A. sec. 7, asigna a los tribunales el deber de aclarar las lagunas o áreas oscuras en la ley. Así pues, al interpretar un estatuto, hay que proveer un sentido lógico a sus diversas disposiciones y suplir posibles deficiencias cuando sea necesario. Alonso García v. S.L.G., 155 D.P.R. 91, 99-100 (2001); Sucn. Álvarez v. Srio. de Justicia, *supra*; Pueblo v. Ferreira Morales, 147 D.P.R. 238, 267 (1998). De surgir alguna ambigüedad en el texto del estatuto, los tribunales deben asegurarse que la interpretación cumple con los propósitos legislativos. Morales v. Marengo, 181 D.P.R. 852, 859 (2011). Para esto, es menester considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarla y la interpretación

debe atribuirle un sentido que asegure el resultado que originalmente se quiso obtener. Para ello, auscultamos la exposición de motivos, la cual generalmente recoge el propósito que inspiró su creación. Pueblo v. Zayas, 147 D.P.R. 530, 539 (1999). En los casos en que la ley carece de una exposición de motivos o, cuando aun teniéndola, no contiene la intención legislativa, es útil consultar otros documentos tales como los informes de las comisiones que estudiaron el proyecto de ley y los debates celebrados cuando la medida fue discutida en el hemiciclo según aparecen en el Diario de Sesiones. Íd. También son pertinentes los anteproyectos y los informes que son preparados fuera de la Asamblea Legislativa, cuando esta los tiene ante sí y adopta sustancialmente esos anteproyectos. Íd.

Además, es un principio reiterado que las leyes no han de ser interpretadas tomando aisladamente algunas de sus secciones, párrafos u oraciones, sino que deben serlo tomando en consideración todo su contexto. González Hernández v. González Hernández, *supra*, pág. 765. También, el análisis que realice el tribunal debe evitar la aplicación literal de la ley si esto resulta en consecuencias absurdas; la interpretación debe ser razonable y consistente con el propósito legislativo. Pueblo v. Mantilla, 71 D.P.R. 36, 43-44 (1950). Por ello, si entre dos interpretaciones una es cónsona con la validez de la ley, a ella se debe ceñir la función judicial. P.S.P. v. Com. Estatal de Elecciones, 110 D.P.R. 400, 456 n.2 (1980) (Op. Concurrente del Juez Asociado señor Díaz Cruz). Asimismo, ante una situación de posibles

conflictos de disposiciones legales, los tribunales deben, en lo posible, conciliar las mismas para lograr un resultado lógico y razonable que represente la intención legislativa. Fernández v. Srio. de Hacienda, 122 D.P.R. 636, 647 (1988).

En fin, "[l]os tribunales estamos autorizados a interpretar las leyes cuando, entre otras, éstas no son claras o concluyentes sobre un punto en particular; cuando el objetivo, al realizarlo, es el de suplir una laguna en la misma; o cuando, con el propósito de mitigar los efectos adversos de la aplicación de una ley a una situación en particular, la justicia así lo requiere". Pueblo v. Ortega Santiago, 125 D.P.R. 203, 214 (1990). Según mencionado, esta función judicial está limitada por la doctrina de autolimitación judicial y por los principios de hermenéutica previamente esbozados. Más aún, como parte de la función interpretativa de la Rama Judicial, este Tribunal debe asegurarse de que las leyes cumplan con nuestro ordenamiento constitucional.

## B. El retiro de los jueces y el derecho constitucional de Estados Unidos

La Constitución del Estado Libre Asociado de Puerto Rico establece un sistema republicano de gobierno basado en la doctrina de separación de poderes entre la Rama Legislativa, la Rama Ejecutiva y la Rama Judicial. Negrón Soto v. Gobernador, 110 D.P.R. 664, 666 (1981). Ello parte de la premisa de que es necesario y saludable un equilibrio para evitar la concentración excesiva de poder en una sola Rama y mantener una democracia verdadera. Véase AAR, Ex parte, 187

D.P.R. 835 (2013). Nuestros Constituyentes adoptaron la doctrina de separación de poderes, según desarrollada y establecida en la Constitución de Estados Unidos. Veamos su origen y desarrollo en la jurisdicción federal.

La Constitución de Estados Unidos fue aprobada en 1787 y estuvo animada por cinco principios rectores, entre los cuales figuraron la división de poderes en la estructura del gobierno central, la garantía de libertades individuales y el establecimiento de un poder judicial federal que sirviera de árbitro y garantizara esos principios. J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis, 2009, págs. 3-4. Sus propulsores hicieron una campaña política intensa mediante la publicación de una serie de ensayos conocidos en conjunto como "El Federalista" en los que explicaban a la ciudadanía la necesidad de aprobar la Constitución federal. Íd., pág. 4. Por consiguiente, estos documentos constituyen una fuente principal para interpretar el significado original de esa Constitución. Íd. En el artículo Núm. 78 de "El Federalista", el más influyente de esta publicación,[31] el constituyente Alexander Hamilton reconoció que el Poder Judicial es el más débil de los tres Poderes de Gobierno y explicó lo siguiente:

> Whoever attentively considers the different departments of power must perceive, that, in a government in which they are separated from each other, the judiciary, from the nature of it functions, will always be the least dangerous to the political right of the Constitution; because it will be least in a capacity to annoy or injure

---

[31] Serrano Geyls, *op. cit.*, pág. 35.

them. The Executive not only dispenses the honors, but holds the sword of the community. The Legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The Judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments.

This simple view of the matter suggests several important consequences. **It proves incontestably, that the judiciary is beyond comparison the weakest of the three departments of power; that it can never attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks.** It equally proves that though individual oppression may now and then proceed from the courts of justice, the general liberty of the people can never be endangered from that quarter; […] And it proves, in the last place… that as, from the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed, or influenced by its co-ordinate branches; and that as nothing can contribute so much to its firmness and independence as permanency in office, **this quality may therefore be justly regarded as an indispensable ingredient in its constitution, and, in a great measure, as the citadel of the public justice and the public security.** The Federalist Papers, Mentor, 1961, págs. 465-466. (Citas internas omitidas). (Énfasis suplido).

Ante la vulnerabilidad de la Judicatura, los autores de la Constitución estadounidense entendieron necesario proveer garantías particulares a los jueces para asegurar su independencia y proteger a los ciudadanos. Nuevamente, según Hamilton:

[n]ext to permanency in office, nothing can contribute more to the Independence of the judges than a fixed provision for their support. […] **In the general course of human nature, a power over a man's subsistence amounts to a power over his will. And we can never hope to see realized in practice, the complete separation of the judicial from the**

**legislative power, in any system which leaves the forms dependent for pecuniary resources on the occasional grants of the latter.** […] The plan of the convention accordingly has provided that the judges of the United States "shall at stated times receive for their services a compensation which shall not be diminished during their continuance in office".

A man may then be sure of the ground upon which he stands, and can never be deterred from his duty by the apprehension of being placed in a less eligible situation […] The salaries of judicial officers may from time to time be altered, as occasion shall require, yet so as never to lessen the allowance with which any particular judge comes into office, in respect to him. Íd., págs. 472-473. (Citas internas omitidas). (Énfasis suplido).

A raíz de toda esta discusión, los forjadores de la Constitución federal incluyeron en la Sección 1 del Artículo III la llamada "cláusula de compensación", que establece lo siguiente: "[l]os jueces, tanto del Tribunal Supremo como de tribunales inferiores, desempeñarán sus cargos mientras observen buena conducta y en determinadas fechas recibirán por sus servicios una compensación que no será rebajada mientras desempeñen sus cargos". Art. III, Sec. 1, Const. E.E.U.U., L.P.R.A., Tomo 1.[32] Para encontrar una violación a esta disposición constitucional, basta con que la ley en cuestión reduzca la compensación de los jueces, sin importar el propósito que haya tenido el Congreso al aprobarla. United States v. Hatter, 532 U.S. 557, 577 (2001). También quedan prohibidas constitucionalmente las reducciones indirectas mediante leyes especiales, como lo sería un impuesto

---

[32] El texto en inglés lee como sigue: "The judges, both of the supreme and inferior courts, shall… receive for their services, a compensation, which shall not be diminished during their Continuance in Office". Art. III, Sec. 1, Const. E.E.U.U., L.P.R.A., Tomo 1.

contributivo que aplique solamente a los jueces. United States v. Hatter, *supra*, pág. 569; Evans v. Gore, 253 U.S. 245, 254 (1920). Ahora bien, se permite disminuir indirectamente los sueldos de los jueces mediante legislación de aplicación general a toda la ciudadanía, como lo sería un aumento general en las contribuciones sobre ingreso. United States v. Hatter, *supra*. Véanse, además, United States v. Will, 449 U.S. 200, 226 (1980); O'Malley v. Woodrough 307 U.S. 277, 282 (1939).

En lo pertinente al caso que hoy atendemos, el Tribunal Supremo federal ha resuelto que la palabra "compensación" incluye los salarios de los jueces y otros beneficios, como sus pensiones de retiro. Véase Booth v. United States, 291 U.S. 339 (1934). Véase, además, J.J. Álvarez González, La Asamblea Legislativa de Puerto Rico y las Pensiones de los Jueces del Tribunal Supremo: Reseña de un Conflicto con la Independencia Judicial, 56 Rev. Jur. U.P.R. 265, 298 (1987). Incluso, el máximo foro federal ha determinado que el Congreso no puede reducir la pensión de los jueces federales de forma retroactiva. Booth v. United States, *supra*, pág. 352.

De la misma forma, muchos tribunales estatales de Estados Unidos han concluido que la compensación de los jueces incluye sus pensiones y que estas no pueden reducirse retroactivamente. Véanse, a modo ilustrativo, Voorhes v. Sagadahoc County, 900 A.2d 733, 736-738 (Me. 2006); Lee v. State Bd. of Pension, 739 A.2d 336, 344-345 (Del. 1999); White v. Employees' Retirement System, 565 A.2D 839, 842-843

(Pa. 1989); Bd. of Trustees of Pub. Emp. Ret. Fund v. Hill, 472 N.E. 2d 204, 209 (Ind. 1985); Hudson v. Johnstone, 660 P.2d 1180, 1184-1185 (Alaska 1983); Wagoner v. Gainer, 279 S.E. 2d 636, 640-643 (W.Va. 1981); Marvel v. Dannemann, 490 F. Supp. 170, 176-177 (D. Del. 1980); Olson v. Cory, 636 P.2d 532, 539 (Cal. 1980); Betts v. Bd. of Administration, 582 P.2d 614, 617 (Cal. 1978); Miles v. Tenn. Consol. Retirement System, 548 S.W.2d 299, 304-305 (Tenn. 1977); Stiftel v. Carper, 378 A.2d 124, 131 (Del. Ch. 1977), confirmado en, 384 A.2d 2, 57 (Del. 1977); Sylvestre v. State, 214 N.W.2d 658, 666-667 (Minn. 1973); McKenna v. Com. State Emp. Retirement Bd., 421 A.2d 1236, 1243 (Pa. 1960).

Por ejemplo, tan reciente como en el 2012, la Corte Suprema de Nueva Jersey resolvió que:

> [n]o cuestionamos las buenas intenciones de la Legislatura al aprobar el Capítulo 78 [legislación que reformaba el sistema de retiro y los beneficios de salud de los empleados públicos, entre los cuales se encontraban jueces en funciones]. No presumimos que el Capítulo 78 fue aprobado en un intento por intimidar o influenciar a la Judicatura. **Sin embargo, independientemente de las buenas intenciones que haya tenido la Legislatura al momento de aprobar el Capítulo 78, el cual es de aplicación general a todos los empleados públicos estatales, el mensaje de los constituyentes es claro. La Constitución prohíbe la reducción del salario neto de un juez durante el término de su nombramiento.**
>
> Sostenemos que el Capítulo 78, en su aplicación a los jueces en funciones al momento de su aprobación, viola el Capítulo 6, Sección 6, Párrafo 6 de la Constitución de Nueva Jersey de 1947. DePascale v. State, 47 A.3D 690, 705 (2012). (Traducción nuestra). (Énfasis suplido).

## C. El retiro de los jueces y el derecho constitucional de Puerto Rico

Con esto como trasfondo histórico, el 25 de julio de 1952, se aprobó la Constitución del Estado Libre Asociado de Puerto Rico y se adoptó el modelo federal de separación de poderes mediante el establecimiento de un sistema republicano de gobierno compuesto por un Poder Legislativo, un Poder Ejecutivo y un Poder Judicial. Art. I, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1. Nuestra Ley Suprema estableció que el Poder Judicial "se ejercerá por un Tribunal Supremo, y por aquellos otros tribunales que se establezcan por ley". Art. V, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1.

Tomando como modelo varias constituciones estatales, especialmente la de Nueva Jersey, los miembros de la Convención Constituyente incluyeron varias disposiciones para reconocer la autonomía administrativa y la independencia de la Rama Judicial, así como para adoptar las garantías concedidas por la Constitución estadounidense a los jueces federales.[33] De hecho, hemos expresado que "[l]as disposiciones del Artículo sobre la Rama Judicial fueron redactadas en forma tal que aseguraran a la comunidad una judicatura independiente". González Vélez v. Tribunal Superior, 75 D.P.R. 585, 609 (1953).

A esos efectos, nuestra Ley Suprema proveyó para que el número de jueces del Tribunal Supremo solo pueda variarse por

---

[33] El Art. V de nuestra Constitución usó como precedente directo el Art. VI de la Constitución de Nueva Jersey y la Ley de la Judicatura de Inglaterra de 1873 a 1875. 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2610 (1961).

ley a solicitud del propio Tribunal, garantizó a los jueces del Tribunal Supremo la permanencia en sus cargos mientras observen buena conducta y confirió a los demás jueces el derecho a ocupar sus puestos por términos fijos de duración aun cuando se elimine un tribunal o una sala de este. Art. V, Secs. 3, 8 y 13, Const. E.L.A., L.P.R.A., Tomo 1. También estableció que los jueces del Tribunal Supremo solo pueden ser destituidos por las causas y mediante el procedimiento instaurado en la Constitución, mientras que los demás jueces solo pueden destituirse por el proceso dispuesto por ley. Art. V, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1. Véase González Vélez v. Tribunal Superior, *supra*.

De igual forma, los Constituyentes imitaron e incluyeron en nuestra Máxima Ley las protecciones concedidas por la Constitución federal a los jueces federales contra reducciones en su compensación. Íd. En particular, la Sección 11 del Artículo VI contiene la llamada "cláusula de no disminución" la cual dispone que: "[l]os sueldos del Gobernador, de los Secretarios de Gobierno, de los miembros de la Asamblea Legislativa, del Contralor y de los Jueces se fijarán por ley especial y, con excepción del sueldo de los miembros de la Asamblea Legislativa, no podrán ser disminuidos durante el término para el cual fueron electos o nombrados". Art. VI, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1. Asimismo, la Sección 10 del mismo artículo establece que: "[n]inguna ley prorrogará el término de un funcionario público ni disminuirá su sueldo o emolumentos después de su

elección o nombramiento". Art. VI, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1.

Por otra parte, con mayor especificidad que la Constitución federal, nuestra Constitución provee expresamente en su Sección 10 del Artículo V que: "[l]a Asamblea Legislativa establecerá un sistema de retiro para los jueces, retiro que será obligatorio cuando hubieren cumplido setenta años de edad". Art. VI, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1. Valga señalar que este es el único sistema gubernamental de retiro investido de rango constitucional. García Martínez v. Gobernador, 109 D.P.R. 294, 297 (1979). Véase, además, Álvarez González, Pensiones de los Jueces, supra, págs. 297-298.

Al igual que la jurisdicción federal cuenta con "El Federalista" para interpretar la Constitución estadounidense, nuestro ordenamiento cuenta con el Diario de Sesiones de la Convención Constituyente para interpretar nuestra Ley Suprema, con la ventaja de que esta fue aprobada hace solo unas décadas mientras que su homóloga federal se aprobó hace más de dos siglos. Dichos documentos contienen los debates que precedieron la aprobación de nuestra Constitución, por lo que explican claramente el propósito de las protecciones concedidas a nuestros jueces.

En primer lugar, es de notar que inicialmente la Constitución contenía el término "compensación". 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico, 930-941 (2003); 3 Diario de Sesiones de la Convención Constituyente de Puerto Rico, 1974-1975 (2003). Véase Álvarez

González, Pensiones de los Jueces, *supra*, pág. 296. Luego, por razones de estilo, se sustituyó por el término "sueldo", pero ello no cambió el concepto de proveer a nuestros jueces las protecciones que la cláusula de compensación de la Constitución estadounidense garantiza a los jueces federales. Íd. Sobre esto, el Prof. José J. Álvarez González nos explica que:

> se trató meramente de un cambio lingüístico y no de un intento de restringir en la Constitución de Puerto Rico las consecuencias del uso de la palabra 'compensation' en la Constitución federal y en constituciones estatales. Como ocurre con tantas otras disposiciones constitucionales puertorriqueñas, es por lo tanto legítimo y apropiado acudir a la interpretación e historial de la Constitución federal para esclarecer el significado de la nuestra. Álvarez González, Pensiones de los Jueces, *supra*, págs. 296-297.

Además de la palabra "sueldo", los Constituyentes incluyeron en la Sección 10 del Artículo VI de nuestra Ley Suprema la palabra "emolumentos", con la cual se aclaró que la protección constitucional cobija, además del sueldo, otros beneficios relacionados con el cargo del funcionario público. Sobre esta sección, el profesor Álvarez González sostiene que: "[e]sta cláusula es también de entera aplicación a los jueces, como el historial de su aprobación por la Constituyente revela". Álvarez González, Pensiones de los Jueces, *supra*, pág. 301. El proceso de aprobación de estas dos secciones estuvo íntimamente ligado, por lo que deben interpretarse en conjunto. Íd., pág. 296; J. Trías Monge, 3 Historia Constitucional de Puerto Rico 226-227 (1982). De hecho, al discutir la facultad de la Asamblea Legislativa de disminuir su propio sueldo contrario a la prohibición de

disminuir los sueldos de los demás funcionarios públicos, finalmente contenida en la Sección 10 del Artículo VI, el Delegado Luis Negrón López explicó que ello es "una protección para los funcionarios del gobierno, de manera que no puedan ser castigados por su actuación independiente. **Que el poder legislativo no [...] disminuya sus sueldos como un castigo. De manera que es una protección a la independencia de los funcionarios de la rama ejecutiva y judicial**". 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico, 298 (2003). (Énfasis suplido).

El Presidente de la Comisión de la Rama Judicial de la Convención Constituyente, el Delegado Ernesto Ramos Antonini, expuso ante la consideración de los Constituyentes que la eficiencia y el funcionamiento de la Rama Judicial dependerían de la independencia judicial. 1 Diario de Sesiones de la Convención Constituyente de Puerto Rico, 452 (2003). Explicó que la estructura de gobierno que se creó al aprobarse la Constitución estuvo inspirada en la independencia judicial, cuya función es "garantizar en nuestra vida política, social y económica un régimen de derecho a diferencia de un régimen de fuerza o de hombres". Íd. Incluso, enumeró como una de las características que garantizan la independencia del poder judicial:

> la que se refiere a la compensación de los jueces. En esta proposición se establece, categóricamente, que no se podrá disminuir la compensación de ningún juez durante su incumbencia. No hay necesidad de explicar el alcance de esa disposición. Y asimismo se establece que la Legislatura de Puerto Rico aprobará un sistema de retiro para los jueces. Esto tiende a dar un sentido de estabilidad a los jueces en el

desempeño de sus funciones, tan delicadas en nuestra sociedad. Íd., págs. 452-453.

Del mismo modo, el Delegado Leopoldo Figueroa Carreras señaló que "[e]l juez necesita, para poder desempeñar su ministerio libremente, tener la garantía de la estabilidad del cargo". 1 <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico</u>, 465 (2003).

**Incluso, el historial de la Asamblea Constituyente deja claro que ni siquiera una crisis presupuestaria en las arcas del Gobierno justificaría afectar la protección provista a los jueces contra la reducción de sus sueldos y emolumentos, ya que ello afectaría la independencia judicial.** Veamos:

> Sr. REYES DELGADO: Se me ocurre que el texto, tal como lee, pudiera interpretarse en el sentido de que en un momento de crisis no se les pudiera disminuir el sueldo a todos los funcionarios y empleados, lo que no sería un castigo, sino que pudiera ser necesario en cualquier momento dado. Si eso está cubierto, o si es el propósito del artículo que no se pueda disminuir el sueldo, independientemente de crisis o lo que hubiere, que justificare una acción de esa naturaleza por la Legislativa.
>
> **Sr. NEGRÓN LÓPEZ: … [O]bserve el compañero que esto se refiere únicamente a los funcionarios y no a empleados. Los sueldos de los empleados fluctuarán de acuerdo con las condiciones del erario público y las condiciones de la vida del país. Ahora, en cuanto a los funcionarios, es posible que surja el mal que apunta el compañero, o sea que en una época de crisis no se puedan ajustar los sueldos a los valores, pero yo entiendo que podemos correr ese riesgo, en aras de la independencia de la actuación de los funcionarios, porque yo no creo que pueda haber castigos legislativos impuestos contra los empleados por el poder legislativo; pero sí creo que los funcionarios, que son los que pueden tomar decisiones que pueden ser lesivas a lo que el poder legislativo considere su interés, por discrepancia o conflicto que puedan existir en determinado momento, ésos, que siempre serán un número mucho más limitado, deben estar protegidos mediante una disposición constitucional.** 2 <u>Diario de Sesiones</u>

de la Convención Constituyente de Puerto Rico, 298 (2003). (Énfasis suplido).

Vemos, pues, que la protección contra la reducción de sueldos y emolumentos, así como el sistema de retiro de los jueces, son de rango constitucional y tienen como propósito asegurar la independencia judicial. Así lo hemos reconocido en Negrón Soto v. Gobernador, 110 D.P.R. 664, 666 (1981) y García Martínez v. Gobernador, 109 D.P.R. 294, 297-298 (1979). Véase, además, Rosa Resto v. Rodríguez Solís, 111 D.P.R. 89, 94 (1981).

En cumplimiento con el mandato constitucional de la Sección 10 del Artículo V, la Asamblea Legislativa creó en el 1954 el sistema de retiro de los jueces mediante la Ley Núm. 12 de 19 de octubre de 1954, 4 L.P.R.A. sec. 233 *et seq*. Sobre la distinción entre el sistema de retiro de los jueces y el resto de los sistemas de retiro que carecen de rango constitucional, la Legislatura aseguró que no se trataba de un privilegio para los jueces, pues **la independencia judicial es para proteger a los ciudadanos**. Véase Diario de Sesiones de la Asamblea Legislativa, pág. 2003 (1954). Véase, además, Bayron Toro v. Serra, 119 D.P.R. 605 (1987). De esta forma, se garantiza que a un juez no se le reduzca su compensación como represalia por una decisión tomada.

En síntesis, el establecimiento de un sistema de retiro para los jueces y las cláusulas de no reducción de sueldos y emolumentos fortalecen la independencia judicial. Álvarez González, Pensiones de los jueces, *supra*, pág. 298. Negrón Soto v. Gobernador, *supra*, pág. 666. Así lo expresó el

Representante Santiago Polanco Abreu, quien sostuvo que "[u]n sistema de pensiones como el que proponemos consagrará definitivamente el principio de independencia judicial". Diario de Sesiones de la Asamblea Legislativa, pág. 150 (1954). Por nuestra parte, hemos reconocido esta intención al expresar que:

> [e]l propósito del Sistema de Retiro de la Judicatura es establecer un medio eficiente para proveer a los jueces retirados pensiones y otros beneficios. Se diseña un mecanismo mediante el cual los jueces del Estado Libre Asociado de Puerto Rico acumulan reservas para su vejez, incapacidad, separación del servicio o muerte, garantizando así la independencia del poder judicial. Debe tenerse siempre presente el propósito de la Convención Constituyente de garantizar la independencia judicial y que uno de los medios para garantizarla es el establecimiento de un sistema de retiro para los jueces, de suerte que el juez durante su gestión esté libre de preocupaciones económicas al retirarse. García Martínez v. Gobernador, *supra*.

Tres décadas después de la creación del Sistema de Retiro de la Judicatura, se aprobó la Ley Núm. 17 de 24 de julio de 1985, la cual dio paso a una controversia de especial pertinencia al caso que nos ocupa. Esa ley redujo retroactivamente las pensiones de retiro de todos los jueces incumbentes y jubilados del Tribunal Supremo. Esto originó una acción declaratoria, similar a la que hoy nos ocupa, en la que se impugnó la aplicación retroactiva de la ley. Dávila v. E.L.A.. El Tribunal Superior dictó una Sentencia en la que declaró inconstitucional la ley impugnada por violar las Secciones 10 y 11 de la Constitución, *supra*. El tribunal sostuvo que: "[l]a Ley número 17, que redujo los beneficios de pensiones previamente conferidos a jueces retirados y a jueces incumbentes, es inconstitucional en cuanto a ellos se

refiere, por disminuir los beneficios y los emolumentos provistos para un cargo judicial, lo que está constitucionalmente prohibido". Dávila v. E.L.A., *supra*, pág. 66. En su Sentencia, advirtió que:

> **si se acepta, como sugiere la parte demandada, que se puede por ley disminuir el derecho a pensión previamente concedido a los jueces en funciones, se frustraría el propósito y el motivo de la disposición constitucional porque expondría al sistema judicial, que depende enteramente de las otras ramas de gobierno para su composición y financiamiento, a las represalias, presiones y a las situaciones de indebida intervención que la propia disposición constitucional quiere evitar en garantía de la independencia judicial. Aunque, ciertamente, ese no aparenta ser en forma o manera alguna el motivo o el propósito de la ley bajo consideración, la realidad es que, obviada toda otra consideración de sostenerse su validez se daría el potencial futuro para el logro indirecto de lo que la Constitución de Puerto Rico prohíbe y trata de evitar.** Íd. (Énfasis suplido).

Inconforme, el Estado acudió ante este Tribunal. Paralelamente, el Secretario de Justicia de aquel entonces, Hon. Héctor Rivera Cruz, emitió una opinión en la que expresó que:

> [u]na legislación como la propuesta, atenta contra el principio de la independencia judicial y es susceptible de ser declarada inconstitucional por los tribunales. De plantearse nuevamente ante los tribunales la naturaleza de los planes de pensiones y los límites que a la acción legislativa impone la Constitución … podemos razonablemente anticipar que el Tribunal concluiría que el proyecto radicado adolece de graves fallas constitucionales. Op. Sec. de Justicia del 23 de julio de 1985.

Por ello, el Estado presentó una Moción de Desistimiento en la que se allanó al dictamen de inconstitucionalidad. Hizo referencia a la Opinión del Secretario de Justicia aquí reseñada. Además, en su moción señaló que el entonces

Gobernador, Hon. Rafael Hernández Colón, expresó al firmar la ley impugnada que: "[e]l examen del desarrollo de las doctrinas de derecho en cuanto a la facultad de la Asamblea Legislativa para alterar o modificar mediante enmienda a la Ley del Sistema de Retiro de la Judicatura, los derechos de los participantes en dicho sistema, arroja dudas sobre la validez constitucional de dicha acción legislativa".

En su moción de desistimiento, el Estado también indicó que el Primer Ejecutivo había presentado en la Asamblea Legislativa un proyecto de administración para enmendar la Ley de la Judicatura: "a los fines de ajustarla a los preceptos constitucionales diseñados para garantizar la independencia judicial a la luz de lo establecido en reciente Sentencia dictada por el Tribunal Superior, Sala de San Juan en [Dávila v. E.L.A.]". En vista de lo anterior, este Tribunal aceptó el desistimiento y ordenó el archivo definitivo y con perjuicio del recurso presentado por el Estado. Para un análisis sobre este caso, véase, además, Álvarez González, Pensiones de los Jueces, supra.

El profesor Álvarez González analizó esa Sentencia del Tribunal Superior y describió como "encomiable" el propósito de la ley impugnada de reducir la pensión de los jueces del Tribunal Supremo, debido a las condiciones económicas en que se encontraba el País. Álvarez González, Pensiones de los Jueces, supra, pág. 305. Sin embargo, señaló que: "[e]l error de la Ley 17 fue su retroactividad". Íd. Además, opinó que la repercusión más evidente de lo resuelto en Dávila v. E.L.A., supra, sería que: "[e]xigirá cautela de las ramas políticas

cuando estas consideren medidas que puedan tener impacto sobre la Rama Judicial. El principio de la independencia judicial ha quedado muy fortalecido tras *Dávila v. ELA"*. Álvarez González, Pensiones de los Jueces, *supra*, pág. 306.

Definitivamente, esa decisión reiteró que la Constitución prohíbe a la Asamblea Legislativa reducir retroactivamente los beneficios de retiro de los jueces. Al igual que el caso ante nos, el Estado era parte demandada en Dávila v. E.L.A., *supra*. Desde entonces, las Ramas Políticas han respetado esta normativa constitucional y todos los gobernadores la han observado hasta la aprobación de la Ley Núm. 162-2013.[34] En este sentido, amerita destacar que en su única expresión con relación al asunto ante nuestra consideración, el Secretario de Justicia concluye que no tenía objeción a la versión original del proyecto porque era aplicable tan solo a futuros jueces.

En fin, la protección contra la disminución retroactiva de los sueldos y emolumentos de los jueces, cuyo propósito es la protección de la independencia judicial, aplica también a las pensiones de retiro y otros beneficios económicos

---

[34] Véanse los cambios realizados al Sistema de Retiro de la Judicatura anteriormente: Ley Núm. 14 de 30 de abril de 1956; Ley Núm. 103 de 26 de junio de 1957; Ley Núm. 48 de 15 de junio de 1962; Ley Núm. 78 de 25 de junio de 1964; Ley Núm. 164 de 29 de junio de 1968; Ley Núm. 71 de 25 de junio de 1969; Ley Núm. 72 de 25 de junio de 1969; Ley Núm. 21 de 26 de abril de 1972; Ley Núm. 75 de 31 de mayo de 1972; Ley Núm. 94 de 9 de junio de 1972; Ley Núm. 142 de 23 de julio de 1974; Ley Núm. 2 de 4 de Enero de 1983; Ley Núm. 17 de 24 de julio de 1985; Ley Núm. 81 de 9 de julio de 1986; Ley Núm. 20 de 8 de diciembre de 1989; Ley Núm. 21 de 8 de diciembre de 1989; Ley Núm. 66 de 16 de septiembre de 1992; Ley Núm. 34 de 28 de julio de 1993; Ley Núm. 25 de 28 de abril de 1996; Ley Núm. 55 de 11 de abril de 2002; Ley Núm. 548 de 1 de octubre de 2004; Ley Núm. 54 de 28 de junio de 2007.

relacionados con el cargo. Véase Álvarez González, Pensiones de los Jueces, supra, pág. 298.

III.

Concluida esta exposición normativa, pasemos a analizar los méritos de la controversia que se ha traído ante nuestra consideración. Para ello, debemos repasar la reforma establecida mediante la Ley Núm. 162-2013. Esta ley establece dos tipos de pensión y sus disposiciones entran en vigor en dos fechas distintas, lo cual crea tres categorías de jueces.

En primer lugar, la reforma provee una pensión que no excederá del 60% del sueldo más alto devengado como juez para todos aquellos nombrados en o antes del 30 de junio de 2014 (Pensión 60%).[35] En segundo lugar, establece un Programa Híbrido, el cual instituye una anualidad vitalicia que incluye un componente de beneficio definido y otro de contribución definida para todo juez nombrado por primera vez a partir del 1 de julio de 2014 (Programa Híbrido).[36] Sin embargo, las disposiciones que establecen la Pensión 60% no aclaran cuándo comienza su aplicación, pues la ley solo menciona hasta qué fecha aplicará: el 30 de junio de 2014. Lo que sí surge de la ley es que, al tener vigencia inmediata, entró en vigor el 24 de diciembre de 2013. Esto tiene como efecto práctico la creación de tres categorías de jueces: 1) los jueces nombrados a partir del 1 de julio de 2014; 2) los

---

[35] También se aumenta la aportación individual al 10% pero mantiene la edad de retiro y otros beneficios inalterados.

[36] Para estos participantes se aumenta la aportación individual al 12%, se aumenta la edad de retiro a 65 años y se cierran las transferencias de otros sistemas de retiro, entre otras cosas.

jueces nombrados entre el 24 de diciembre de 2013 y el 30 de junio de 2014; y 3) los jueces nombrados en o antes del 23 de diciembre de 2013, estén en funciones o jubilados.

Las partes demandantes alegan que la Pensión 60% aplica retroactivamente a los jueces en funciones y que esto contraviene lo dispuesto en nuestra Constitución. Por ello, nos invitan a decretar la inconstitucionalidad de la Ley Núm. 162-2013. No obstante, según las normas de autolimitación judicial y los principios de hermenéutica antes esbozados, tenemos la obligación de concebir una interpretación razonable de la ley, cónsona con la intención legislativa, que evite decretar la inconstitucionalidad de todo el estatuto. Para ello, debemos analizar todas sus disposiciones en conjunto, teniendo en mente que esta contiene una cláusula de separabilidad.

Ante las serias deficiencias y lagunas en el texto de la Ley Núm. 162-2013, hemos consultado todas las fuentes del historial legislativo y ninguna señala que la intención del legislador fuera conferir un carácter retroactivo a la reforma del Sistema de Retiro de la Judicatura. En todo caso, de la exposición de motivos, de las ponencias presentadas, de los informes positivos y del Diario de Sesiones, se desprende un contundente y fundamentado apoyo al P. de la C. 1595 original por ser aplicable únicamente a los jueces nombrados por primera vez a partir del 1 de julio de 2014.

Examinado el historial legislativo, procede analizar todas las disposiciones de la ley en conjunto, para determinar cómo aplican a las tres categorías de jueces antes

enumeradas. No hay duda de que el Programa Híbrido aplica prospectivamente a todos los jueces nombrados por primera vez a partir del 1 de julio de 2014, por lo que no está en controversia su constitucionalidad. Asimismo, la Pensión 60% es aplicable a los jueces nombrados por primera vez entre el 24 de diciembre de 2013 y el 30 de junio de 2014, por lo que tampoco tiene visos de inconstitucionalidad. Indiscutiblemente, tanto el Programa Híbrido como la Pensión 60% son válidas ya que los jueces nombrados por primera vez a partir del 24 de diciembre de 2013 entrarán al Sistema de Retiro de la Judicatura aceptando esos términos y condiciones. En otras palabras, en lo que respecta a esas dos categorías de jueces, no estamos ante una disminución de sueldo o emolumentos, pues no han sido nombrados al momento de aprobarse la ley.

En cambio, a los jueces nombrados en o antes del 23 de diciembre de 2013 les aplica la normativa constitucional de que la pensión de un juez forma parte de su sueldo, y por tal razón, está protegida por las Secciones 10 y 11 del Artículo VI de nuestra Constitución, *supra*. Por tanto, es forzoso concluir que aplicar a los jueces en funciones y ya jubilados la Ley Núm. 162-2013, y en particular sus Secciones 1, 2, 3, 10, 12, 13, 14 y 15 representaría una disminución de sus sueldos y emolumentos claramente vedada por nuestro ordenamiento constitucional.

Por otro lado, nótese que el título de la ley impugnada anuncia que la reforma va dirigida a: "efectuar **cambios prospectivos** en el esquema legal aplicable al Sistema de

Retiro de la Judicatura y establecer un Programa Híbrido de beneficio definido y contribución definida que habrá de resultar **aplicable a futuros jueces**".[37] (Énfasis suplido). Como es sabido, la Sección 17 del Artículo III de la Constitución exige que el título de todo proyecto de ley exprese claramente el asunto sobre el cual versa y prohíbe que la medida sea enmendada para añadir materias extrañas a lo expresado en su título. Art. III, Sec. 17 Const. E.L.A., L.P.R.A., Tomo 1.[38] Esta es otra razón por la cual, de acuerdo a las normas de autolimitación judicial y de hermenéutica, sostenemos que la Ley Núm. 162-2013 sólo aplica a los jueces nombrados por primera vez a partir del 24 de diciembre de 2013.[39]

Asimismo, esta interpretación confiere contenido a la cláusula derogatoria de la Ley Núm. 162-2013, la cual establece que las leyes o reglamentos que sean contrarios a sus disposiciones quedan derogados salvo lo que "**respecta los derechos adquiridos y beneficios pagaderos de acuerdo con las mismas, [los cuales] continuarán en vigor después de la fecha de vigencia de esta ley**".[40] (Énfasis suplido). El legislador, mediante este inciso, protegió los derechos y beneficios que

---

[37] Ley Núm. 162-2013.

[38] Ninguna de las partes demandantes solicitó que declaráramos la ley inconstitucional por ser contraria a esta disposición.

[39] Sobre este particular, véanse Washington Ass'n for Substance Abuse & Violence Prevention v. State, 278 P.3d 632 (Wash. 2012); Wallace v. Ball, 88 So. 442 (Ala. 1921); McCamey v. Cummings, 172 S.W. 311 (Tenn. 1914).

[40] Sección 18, Ley Núm. 162-2013.

los jueces en funciones y jubilados ya habían adquirido al momento de la vigencia de la ley en cuestión.[41]

Por otra parte, la Ley Núm. 162-2013 incluyó una ventana mediante la cual los jueces que cualifiquen para jubilarse en o antes del 1 de julio de 2015 puedan recibir una pensión mayor a la permitida por la reforma, pero que no exceda el 75% del sueldo más alto devengado como juez.[42] Lógicamente, esta disposición solo podría aplicar a los jueces nombrados en o antes del 23 de diciembre de 2013, pues ningún juez nombrado por primera vez a partir de la vigencia de la ley cualificaría para jubilarse en tan solo año y medio. Esto necesariamente conllevaría una reducción retroactiva de las pensiones de los jueces que pudieran beneficiarse de esa ventana. Peor aún, el efecto práctico de esta disposición sería propiciar el retiro de miembros de la Judicatura de mucha experiencia liberando así plazas que se podrían llenar mediante nuevos nombramientos. Precisamente, eso es lo que se busca evitar por medio de las protecciones constitucionales al sistema de retiro de los jueces, dirigidas a garantizar la independencia judicial. Por estas razones, dicha disposición incluida en la Sección 3 de la Ley Núm. 162-2013 también está vedada por nuestro ordenamiento constitucional. De esta

---

[41] Véase Trinidad Hernández v. E.L.A., 2013 T.S.P.R. 73, 188 D.P.R. ___ (2013).

[42] La parte de la Sección 3 que provee esta ventana establece lo siguiente: "[n]o obstante lo anterior, aquellos participantes que cualifiquen para solicitar una pensión por retiro según se dispone en este Artículo en o antes del 1 de julio de 2015, podrán recibir una pensión igual al setenta y cinco por ciento (75%) del sueldo más alto devengado como juez".

manera, logramos imprimir un sentido lógico a la reforma y suplimos las deficiencias que esta presenta.

Por último, la mención que hacen las Secciones 13, 14 y 15 de la Ley Núm. 162-2013 para excluir "a los participantes del Sistema de Retiro" de los beneficios de aguinaldo de Navidad, bono de verano y bono de medicamentos, solo aplica a jueces nombrados por primera vez a partir del 24 de diciembre de 2013. Una interpretación contraria conllevaría una reducción retroactiva de los emolumentos de los jueces en contra del Art. VI, Sec. 10 de la Constitución. Es importante señalar que esta sección de la Constitución no estaba implicada en Trinidad Hernández v. E.L.A., *supra*. Esa realidad requiere en el caso ante nos un análisis diferente. Ante la aplicabilidad de la prohibición absoluta contenida en esta sección de la Constitución y por los fundamentos expuestos, resulta innecesario abordar el planteamiento de menoscabo de obligaciones contractuales invocado por la Asociación de la Judicatura.

IV.

En resumen, hoy validamos la reforma más significativa que se ha hecho al sistema de retiro de la Judicatura desde su creación hace 60 años. Así pues, los jueces nombrados por primera vez a partir del 1 de julio de 2014 participarán del Programa Híbrido, sujeto a las siguientes condiciones: 1) una aportación individual de 12% al Sistema de Retiro; 2) edad mínima de retiro de 65 años; 3) un servicio mínimo como juez de 12 años para poder acogerse al retiro; 4) recibirán una anualidad vitalicia que incluye un componente de beneficio

definido y otro de contribución definida a computarse utilizando como base el promedio del sueldo del juez en los últimos 5 años previo a su retiro;[43] 5) no recibirán el bono de verano, el bono de medicamentos y el aguinaldo de navidad concedidos mediante leyes especiales; 6) se elimina la pensión de la viuda y se sustituye por una anualidad por traspaso análoga a la de los empleados públicos; 7) se reduce la pensión por incapacidad; y 8) se cierran las transferencias provenientes de otros sistemas de retiro por lo que en el cálculo de la pensión no se dará crédito por

---

[43] La Sección 3 de la Ley Núm. 162-2013, establece la siguiente fórmula para calcular la anualidad vitalicia:

**Artículo 4-C. - Cálculo de Retribución Promedio para Nuevos Participantes.**

La retribución promedio de todo nuevo participante que ingrese por primera vez al Sistema a partir del 1 de julio de 2014, se calculará a base del promedio del sueldo del participante durante los últimos cinco (5) años de servicio. Este período de cinco (5) años será el período base.

**Artículo 4-D.-Anualidades para Nuevos Participantes.**

A.-Anualidad por Años de Servicios.-Los participantes que ingresen por primera vez al Sistema a partir del 1 de julio de 2014 y que formen parte del Programa Híbrido podrán acogerse al retiro a partir de la fecha en que cumplan sesenta y cinco (65) años de edad, hayan completado un mínimo de doce (12) años de servicios como juez y no hayan solicitado ni recibido el reembolso de sus aportaciones acumuladas. El importe de la anualidad que recibirán los participantes del Programa Híbrido al acogerse al retiro será el uno punto cinco por ciento (1.5%) de la retribución promedio, multiplicado por el número de años de servicios como juez del Tribunal General de Justicia.

servicio alguno prestado al Gobierno en cualquier otra capacidad que no sea la de juez.

A los jueces nombrados por primera vez entre el 24 de diciembre de 2013 y el 30 de junio de 2014, les aplicarán las disposiciones de la Ley Núm. 162-2013 relativas a la Pensión 60%, es decir, una aportación individual de un 10% y el derecho a una pensión máxima de 60% del sueldo más alto devengado como juez. Estos jueces también tendrán derecho a recibir el resto de los beneficios concedidos por las leyes anteriores, salvo los bonos otorgados mediante legislación especial.

Los jueces nombrados en o antes del 23 de diciembre de 2013 no sufrirán cambio alguno con respecto al derecho que tienen sobre sus pensiones de retiro. A su vez, continuarán recibiendo los beneficios concedidos mediante las leyes especiales por constituir emolumentos. Las Secciones 1, 2, 3, 10, 12, 13, 14 y 15 de la Ley Núm. 162-2013, así como cualquier parte de esta que los afecte, no aplican a los jueces en funciones y jubilados, en virtud de la prohibición establecida en las Secciones 10 y 11 del Artículo VI de la Constitución, *supra*.

En conclusión, al interpretar que la Ley Núm. 162-2013 aplica a los jueces nombrados por primera vez a partir de su vigencia, respetamos la intención del legislador manifestada en la cláusula de separabilidad, la cual dispone que: "si cualquier párrafo, artículo o parte de esta Ley fuera declarada inconstitucional por un tribunal con competencia y jurisdicción, la sentencia dictada no afectará ni invalidará

el resto de esta Ley, y su efecto se limitará al párrafo, artículo o parte declarada inconstitucional".[44]

Asimismo, protegemos el principio de independencia judicial que asegura al ciudadano que la adjudicación que un juez haga de su caso, aun cuando el propio Estado sea el demandado, será imparcial y libre de las influencias coercitivas de las ramas políticas. Este principio es la razón de ser de la existencia de la Rama Judicial y el baluarte en que descansa la confianza que pueda tener la ciudadanía en la misma.

Con nuestro proceder, remediamos las serias inconsistencias señaladas de la Ley Núm. 162-2013. Solo así cumplimos con nuestro deber de ser los últimos intérpretes de la ley, salvaguardando la deferencia merecida por el legislador y sin socavar el principio cardinal de la independencia judicial.

Se dictará Sentencia de conformidad.

Federico Hernández Denton
Juez Presidente

---

[44] Sección 19, Ley Núm. 162-2013.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Germán J. Brau
    Demandante

      v.

E.L.A. de
Puerto Rico, et als.
    Demandados recurridos

 

Asociación Puertorriqueña de
la Judicatura, representada
por su Presidenta Hon.
Elizabeth Linares
    Peticionaria

      v.

E.L.A. de
Puerto Rico, et als.
    Demandados recurridos

CT-2013-021

SENTENCIA

San Juan, Puerto Rico, a 21 de febrero de 2014.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, los jueces nombrados por primera vez a partir del 1 de julio de 2014 participarán del Programa Híbrido, sujeto a las siguientes condiciones: 1) una aportación individual de 12% al Sistema de Retiro; 2) edad mínima de retiro de 65 años; 3) un servicio mínimo como juez de 12 años para poder acogerse al retiro; 4) recibirán una anualidad vitalicia que incluye un componente de beneficio definido y otro de contribución definida a computarse utilizando como base el promedio del

sueldo del juez en los últimos 5 años previo a su retiro;[45]

5) no recibirán el bono de verano, el bono de medicamentos y el aguinaldo de navidad concedidos mediante leyes especiales; 6) se elimina la pensión de la viuda y se sustituye por una anualidad por traspaso análoga a la de los empleados públicos; 7) se reduce la pensión por incapacidad; y 8) se cierran las transferencias provenientes de otros sistemas de retiro por lo que en el cálculo de la pensión no se dará crédito por servicio alguno prestado al Gobierno en cualquier otra capacidad que no sea la de juez.

---

[45] La Sección 3 de la Ley Núm. 162-2013, establece la siguiente fórmula para calcular la anualidad vitalicia:

**Artículo 4-C. - Cálculo de Retribución Promedio para Nuevos Participantes.**

La retribución promedio de todo nuevo participante que ingrese por primera vez al Sistema a partir del 1 de julio de 2014, se calculará a base del promedio del sueldo del participante durante los últimos cinco (5) años de servicio. Este período de cinco (5) años será el período base.

**Artículo 4-D.-Anualidades para Nuevos Participantes.**

A.-Anualidad por Años de Servicios.-Los participantes que ingresen por primera vez al Sistema a partir del 1 de julio de 2014 y que formen parte del Programa Híbrido podrán acogerse al retiro a partir de la fecha en que cumplan sesenta y cinco (65) años de edad, hayan completado un mínimo de doce (12) años de servicios como juez y no hayan solicitado ni recibido el reembolso de sus aportaciones acumuladas. El importe de la anualidad que recibirán los participantes del Programa Híbrido al acogerse al retiro será el uno punto cinco por ciento (1.5%) de la retribución promedio, multiplicado por el número de años de servicios como juez del Tribunal General de Justicia.

A los jueces nombrados por primera vez entre el 24 de diciembre de 2013 y el 30 de junio de 2014, les aplicarán las disposiciones de la Ley Núm. 162-2013 relativas a la Pensión 60%, es decir, una aportación individual de un 10% y el derecho a una pensión máxima de 60% del sueldo más alto devengado como juez. Estos jueces también tendrán derecho a recibir el resto de los beneficios concedidos por las leyes anteriores, salvo los bonos otorgados mediante legislación especial.

Los jueces nombrados en o antes del 23 de diciembre de 2013 no sufrirán cambio alguno con respecto al derecho que tienen sobre sus pensiones de retiro. A su vez, continuarán recibiendo los beneficios concedidos mediante las leyes especiales por constituir emolumentos. Las Secciones 1, 2, 3, 10, 12, 13, 14 y 15 de la Ley Núm. 162-2013, así como cualquier parte de esta que los afecte, no aplican a los jueces en funciones y jubilados, en virtud de la prohibición establecida en las Secciones 10 y 11 del Artículo VI de la Constitución, *supra*.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.


Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo